**NATIONAL BANK OF DETROIT and Francis C. McMath, as executors of the Estates of Neil C. McMath and Margaret Kales McMath; Francis C. McMath, individually and as sole Trustee of Testamentary Trust under the will of Margaret Kales McMath; and Charles F. McMath, Charlon S. Hibbard, Margaret J. Chester, Elizabeth N. McMath, James L. Hibbard, Margaret M. Herring, Kenneth G. Herring, Bruce M. Herring and Kenneth G. Herring, Jr., Plaintiffs,**

v.

**WHITEHEAD & KALES COMPANY, Walter W. Borland, Robert G. Kales, Robert G. Kales, Jr., Roy L. Thurman, James F. Simpson, Hugo Huettig, III, Kales Kramer Investment Company, Alice Kales Hartwick, Ellen Kales Huettig, The Estate of Hugo G. Huettig, Jr., Alice H. Wenger, Virginia R. Riley, Jane Kales Ryan, William R. Hartwick, Ellen Hartwick Marks, Anne Kales Howson, Ellen Huettig Haynes, and Johnston Industries, Inc., Defendants.**

Civ. A. No. 79-72531.

United States District Court,
E.D. Michigan, S.D.

Dec. 22, 1981.

David Olesker, Bressler, Lipsitz & Rothenberg, New York City, for plaintiffs.

Donald S. Young, Ronald S. Holliday, Detroit, Mich., for defendants, Whitehead & Kales Co. and Walter W. Borland.

Robert A. Fineman, Detroit, Mich., for defendants Johnston Industries, Inc.

Frank S. Galgan, Troy, Mich., for remaining defendants.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Plaintiffs filed their complaint in this matter on July 2, 1979, alleging defendants' violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and of Rule 10(b)(5) of the Rules of the United States Securities and Exchange Commission, 17 CFR ¶ 240.10b–5, in the execution and implementation of a Stock Purchase and Option Agreement and subsequent transactions. Plaintiffs also claim the "control person" liability to them of certain individual defendants under § 20(a) of the Securities Exchange Act of 1934, 15 USC° § 78t(a), as a result of the aforementioned claimed § 10(b) and Rule 10(b)(5) violations; as well as breach of contract by defendant Whitehead and Kales (hereafter "W & K"); breach of W & K's duty to notify plaintiffs of a transaction in W & K stock which occurred in the year following the execution of plaintiffs' Purchase and Option Agreement; wrongful interference with plaintiffs' contract rights by defendant Johnston Industries and certain individual defendants; the wrongful "structuring" of a subsequent transaction in W & K stock to deprive plaintiffs of the benefits of their Agreement; mutual mistake and/or common-law fraud by defendants in the execution of their Agreement; breach of the fiduciary duties owed to plaintiffs by defendants; and unjust enrichment. The jurisdiction of this court is proper, under 15 U.S.C. § 78aa.; and pendent jurisdiction exists over plaintiffs' claims under the common-law of the State of Michigan.

Bench trial of the matter was commenced on November 6, 1981, and after plaintiffs' evidence had been presented for the following ten days, plaintiffs rested and defendants presented their motion, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, for an involuntary dismissal on the grounds that plaintiffs had shown no right to relief. That rule provides that, on such motion:

> The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all evidence.

The court took the defense motion under advisement and requested briefs, which have been filed. Because plaintiffs' case included several defense witnesses and individual defendants, and because cross-examination was extensive and the court is privileged to make its determinations of credibility as finder of fact on such motions, the court is now confident that the plaintiff, on the facts and law applicable, has no right to relief. Accordingly, the motion is granted and plaintiffs' complaint shall be and hereby is, dismissed.

Defendant W & K is a Michigan Corporation engaged in the business of fabricating structural steel and manufacturing railroad autoracks and special autohauling truck trailers. The stock of W & K, up to the time of the transactions discussed herein, was held principally by the members of the four branches of the Kales family; and plaintiff Francis C. McMath is the son of the late Margaret Kales McMath, the head of the McMath branch. For at least the twenty-year period prior to 1975, it appears that the McMath branch dominated management of W & K. Neil C. McMath (husband of Margaret Kales) was the corporation's chief executive officer through the 1960's and plaintiff Francis McMath, who began working for W & K in 1958, had risen to that rank by 1967 and served in that capacity for the next eight years, regularly re-elected by the Board of Directors.

In April, 1975, plaintiff Francis McMath was not re-elected to the corporate Presidency by the Board of Directors, because of differences over corporate management policies. He was replaced by defendant Walter Borland, former executive vice-president. Although he was re-elected as a Director at that same meeting, plaintiff McMath resigned from the Board within the next month because, according to his testimony, he could not emotionally tolerate sitting with the people who had not re-elected him President. In his management positions at W & K, McMath had been either the regular recipient of or well aware of all significant financial and operational data generated by the corporation. As a Director he also, at all times relevant hereto, had the benefit of all quarterly financial reports which were prepared for Directors. He testified to his intimate familiarity with the identity, scope, and content of all of W & K's financial and operational compilations.

In 1969, during Mr. McMath's tenure as corporation President, the other three branches of the Kales family entered into a Voting Trust Agreement, pursuant to which the Trust represented approximately 53% of the outstanding shares of W & K stock. All shareholders so desiring were entitled to join the Trust, the object of which was to sell the corporation at best advantage or to liquidate the beneficiaries' holdings; and Mr. McMath testified that he himself, had been invited to join the Trust, but declined because he would have had no control over it. Five Trustees had been named, pursuant to the Trust Agreement, and all are defendants herein: Messrs. Robert G. Kales, Sr. and Jr., Hugo Huettig, III, James F. Simpson, and Roy L. Thurman.

Four of the voting Trustees were also Directors of the corporation, during the period here relevant. They were Messrs. Kales, Sr. and Jr., Thurman, and Simpson. Kales, Sr. was Chairman of the Board. As Directors, they had regularly reelected Mr. McMath President, even after formation of the Trust, until 1975.

In 1973, Neil C. McMath died; and in 1975 Margaret Kales McMath also died. Mr. McMath and plaintiff National Bank of

Detroit (hereinafter "NDB") were, on both occasions, appointed co-executors of the decedent's estate. Accordingly, by 1975, the "McMath" group, or branch, all of which are plaintiffs herein, owned approximately 60,849, or 36%, of the outstanding shares of W & K stock: and Mr. McMath, after appointment to co-executorship of the two estates, held a leadership position within that group.

Aside from the aforementioned corporate Directors, defendant Walter Borland (then executive vice-president) was elected to the Board in 1974.

The only Board member not a defendant herein was Director William B. Giles, who also served as general counsel to W & K from the 1930's up to and throughout the period here in litigation, to sometime in 1977, and who was a member of the corporation's executive committee. He also had served as personal counsel to Neil and Margaret Kales McMath, became attorney of record for their estates at their respective deaths, and served as personal friend, counselor, and attorney for Mr. McMath and others of the McMath group. When the Board of Directors voted against the re-election of Mr. McMath to the Presidency in April, 1975, Mr. Giles opposed that decision and voted to re-elect him.

Mr. McMath's own testimony was that he remained in constant contact with Giles throughout the events here in litigation. Although the evidence, including Mr. McMath's testimony, indicates that the bank prevailed upon Giles not to resign from the Board when Mr. McMath did, so that the estates would continue to have a voice on the Board, Mr. McMath testified that the one thing he never discussed with Giles in their innumerable conversations thereafter was corporate business, inasmuch as he was piqued at Giles for continuing with those who had treated him, McMath, so poorly. The court is unable to credit that testimony, inasmuch as Mr. McMath continued to rely upon Giles' thoughts, recommendations and approval for all of his own subsequent dealings with the corporation, a behavior incredibly inconsistent with a claim of anger too deep to discuss internal corporate affairs. Mr. McMath appears to claim close contact with Giles only on matters in which notice to Giles might not be construed as notice to him, to his detriment.

At the time of his April, 1975, resignation from the W & K Board of Directors, Mr. McMath voiced his intention to "exit" the corporation, indeed to liquidate the stock ownership of the entire McMath group; and by the summer of 1975 had commenced negotiating for the sale of the McMath stock to a third party, the Bethlehem Corporation. He obtained, for himself and NBD, powers of attorney from all of the individual plaintiffs herein, as well as full authority to negotiate and consummate a sale of all of their stock.

On August 1, 1975, the Bethlehem Corporation expressed an interest in acquisition of 80% of W & K's outstanding shares. That proposal was rejected by the Voting Trust, but the McMath group's negotiations continued and concluded in execution of an option agreement on February 19, 1976, granting Bethlehem the option to purchase all McMath stock at a price of $40.00 per share, $10.00 of which would be payable on exercise and the balance over five years. The book value per share on December 21, 1975, was $97.84 (and had been $86.76 on December 31, 1974, and $76.36 on December 31, 1973). That agreement, and that price, upon which Mr. McMath and NBD (as co-executors of the two estates) agreed, was carefully scrutinized by NBD's Trust Investment Department by specialists in the analysis of estate investments in closely held corporations, and of fair and reasonable stock prices in that context. Trust Officer Driscoll testified that all shareholder information received by the Trust Department was referred to the bank's specialists in this area; but that the bank did not utilize the financial information which W & K had provided to the NBD Commercial Loan Department, over many years of extended dealings, although the bank had been given authority to utilize that data for such purposes.

The Trust Investment Department approved the Bethlehem Option transaction's $40.00 price as fair and reasonable, in concurrence with Mr. McMath, and as recommended by Driscoll, and the bank and McMath executed that agreement. The stock's valuation for estate tax reporting purposes had been $16.00 per share on January 31, 1975, despite the above-quoted book values. Also, Mr. McMath himself had purchased a substantial block of shares in 1974, according to his testimony, for $22.00 per share. He had at that time, been president of the corporation, purchasing for his personal benefit, and had furnished no financial information to those selling shareholders other than that which they had presumably received in due course, in communications to all shareholders in general. He testified that, in his opinion, they were sufficiently informed by those communications to make the determinations appropriate to the transaction.

In late 1975, Bradley P. Driscoll had become the NBD trust officer responsible for the two McMath estates. He is an attorney, a specialist in business and tax matters, who now has replaced Mr. Giles as attorney for the two estates, and who worked closely with Mr. McMath and Mr. Giles on every step taken or not taken on behalf of the McMath group from the time of his arrival forward. Mr. Driscoll, unlike plaintiff McMath, acknowledged that he discussed W & K's internal corporate affairs with Mr. Giles on a regular basis.

In June of 1976, before expiration of the Bethlehem option, Mr. McMath authorized and directed Mr. Driscoll to visit Mr. Borland to inquire whether W & K were interested in purchasing the McMath stock: and Driscoll did so. He testified that McMath's first priority at the time was "an exit" from the corporation. Driscoll and Borland discussed W & K's business and prospects, and Borland advised that the trend was upward, on an improving curve; a fact of which Driscoll was already advised, inasmuch as he had written Mr. Kales in May, 1976 that "the 1975 results are most impressive."

Borland told Driscoll, however, that W & K would not consider his proposition until the Bethlehem option had expired. Driscoll reported this conversation back to Mr. McMath and Giles, as became his practice with all subsequent conversations, correspondence, thoughts and activities surrounding the transactions that followed. Indeed, Giles' time records for representation of the Margaret Kales McMath Estate, which were filed in the Circuit Court for Oakland County, Michigan, reflect numerous meetings and conversations between himself, NBD trust officers, and/or Mr. McMath between January, 1975 and November, 1976, relating to W & K and frequently relating directly to estate efforts to sell the McMath stock.

The Bethlehem option expired unexercised on August 31, 1976, and Driscoll contacted Borland again. Borland told Driscoll to put his proposal in writing so that it could be presented to the Board; and Driscoll did so shortly thereafter. The written proposal, which had been previously reviewed, edited and approved by the NBD Trust Investment Department, Giles, and McMath, offered to sell the McMath stock at $40.00 per share, over a period of time. Three alternatives in the transaction's structure were suggested: conversion of the stock into subordinated debentures, purchase through an Employee Stock Ownership Plan, or outright purchase. Driscoll's letter argued the reasonableness of the $40.00 asking price, acknowledged the lesser sales value of minority shares, as opposed to control shares, noted the current book value, and suggested (with the benefit of the Trust Investment Department's expertise) that "companies in this industry could reasonably be expected to be bought and sold at about 50% of book value for a controlling interest and somewhat less for a minority position such as the McMaths'." Moreover, Driscoll argued further that:

> ... if the voting trust should ever decide to sell or merge their controlling interest in the Company, their price per share should be considerably enhanced by the increased book value and earnings per share to be had through early retirement of the McMath group's interest.

It is, ironically, the occurrence of precisely the eventualities suggested by that letter of sales persuasion by Mr. Driscoll, that has resulted in this lawsuit.

After Driscoll's written proposal, other communications ensued between Borland and Driscoll, which each faithfully reported in full to his principals who, in both cases, included Giles. At the level of the Board of Directors and the Board Executive Committee, as well as with individual Directors, Giles lobbied for W & K's acceptance of Driscoll's offer, and for purchase of the McMath group's stock to accommodate the desire of that estranged branch of the family to exit W & K. Borland advised Driscoll that W & K did not have sufficient cash to make an outright purchase and also could not add significant debt to its balance sheet for such a purchase, at that time.

On September 30, 1976, President Kales wrote to all shareholders, including plaintiffs, that:

> The company continues to be profitable; however, we are still experiencing problems at Bethlehem Fabricators, Inc., which we anticipate will be resolved by year end. If this occurs, it is conceivable that 1977 could be a very good year. We expect to show a profit for 1976.

During this entire period, plaintiffs were sent all financial data generally distributed to shareholders. Mr. Driscoll was provided with additional data, specifically the interim earnings data then current, on October 29, 1976, and the interim balance sheet information through June 30, 1976, which had been requested of him by NBD's Trust Investment closely held corporation-specialists, which he requested of Borland, was furnished by W & K's chief financial officer (Mr. Wieser), and which Driscoll in turn forwarded to his specialists. Borland advised Driscoll that all necessary information would be furnished, on request, by Wieser; and Wieser's cover letter enclosing the aforementioned data invited Driscoll's request for any "additional detail" he might find necessary.

It is undisputed here that none of the plaintiffs or any of their agents ever requested any further information whatsoever of any of the defendants or their agents or beneficiaries. Moreover, Mr. McMath has acknowledged that Mr. Giles told him the company was doing better; and it is undisputed that Mr. Giles never declined to provide Mr. McMath with any information whatsoever.

It should be noted at this point that, shortly after his resignation from the Board of Directors, by letter of May 30, 1975, Mr. McMath had directed to President Borland a request for monthly financial statements by W & K. Borland took this request to the Board of Directors, where Director Simpson testified that he recalled discussing it. Simpson's testimony was that, inasmuch as monthly statements were not even prepared for Directors, unless for a rare special purpose, and Directors themselves only received quarterly reports, the consensus of the Board was to deny Mr. McMath's request and to furnish him no more reports than all other shareholders received. Otherwise, they reasoned, he would be preferred over the 11% of the shareholders who received no such documentation as well, presumably, as over those remaining Directors who had not seen fit to resign from their positions of responsibility. No purchase or sale transaction was then foreseen or contemplated, and the court finds no significance, for present purposes, in the Board's refusal of that request. It bore no relation to the defendants' conduct in the transactions here in suit, during which the evidence is clear that plaintiffs were invited to request all information they deemed necessary, and it did not relieve Mr. McMath or his agents, for all time, of their duty to exercise due diligence under the circumstances as they presented themselves.

On November 14, 1976, Mr. Borland (for W & K) and Mr. Driscoll (under power of attorney for the McMath group) executed a letter of intent pursuant to which W & K would purchase 20,000 shares of McMath stock forthwith, and was to be granted a series of options for purchase of the balance overtime, at an average of $35.30 per share. A penalty of $100,000 would be incurred by

W & K for failure to exercise all options: a fact which this court notes as clearly corroborating all testimony that it was the McMath group which clearly desired the sale. The letter of intent was reviewed and approved by both Mr. McMath and Giles, as usual.

W & K then retained attorney Raymond Schmick to draft the Stock Purchase and Option Agreement, a draft of which was thereafter forwarded to Driscoll and attorney David Carey, who was retained by plaintiffs for its review. Another analysis of the Agreement was conducted by NBD's Trust Investment Department, which focused upon the fairness and reasonableness of its financial terms. Driscoll and the Department's specialists thereafter formally presented the matter to the bank's Trust Investment Committee, requesting approval; and that approval was given. Mr. Driscoll testified that it was highly unusual for the bank to approve options, but that in this case Mr. McMath's strong desire to "exit" from the corporation was given deference. Indeed, Driscoll testified that throughout this period, Mr. McMath had wanted to move more quickly than had the bank, in his determination to remove his branch of the family from all connection with W & K.

Paragraph 10 of the agreement drafted by Schmick provided that the McMath group could elect to terminate unexercised options "in the event of a sale of a controlling interest in the company in which the shareholders generally are entitled to participate." Mr. Driscoll testified that he was concerned whether this paragraph permitted plaintiffs to participate· in any "good things" that might happen to W & K during the years their stock was under option, and that he visited attorney Schmick to discuss paragraph 10. Mr. Schmick told Driscoll that the paragraph would not permit plaintiffs to participate in a private sale. Driscoll (an attorney) was then satisfied with the paragraph. So were attorney Giles, attorney Carey, Mr. McMath, and NBD. The agreement was executed on November 22, 1976.

A special shareholders meeting was held by W & K on December 7, 1976, for the purpose of ratifying the agreement as well as for approval of two employee stock option agreements for Mr. Borland. Prior to the meeting, the requisite detailed proxy statements were sent to all shareholders, including the McMath group. The proxy statements also fully reiterated the specific language of paragraph 10 of the Agreement. The McMath group executed their proxies, voting in favor of all three propositions presented. All three propositions were approved by the shareholders.

On December 10, 1976, the Stock Purchase and Option Agreement transaction was closed. W & K purchased the initial 20,000 shares of McMath stock outright, delivering a certified check and promissory notes totalling $610,000.

Although, as stated above, the purpose of the formation of the Voting Trust in 1969 had been the sale of W & K or of the shares held by Trust beneficiaries, there is no evidence whatsoever in the record tending to indicate that during W & K's negotiations with the McMath group, any prospects at all existed, or negotiations transpired, for sale of Voting Trust shares. It was only after Mr. Borland's May, 1977, mention to an attorney Rosenblum in Washington, D.C. of the Voting Trust's desire to sell, that any such activity developed.

Mr. Rosenblum advised Borland at that time that he felt that he could find a buyer: and thereafter he proceeded to do so. He urged that a sale be accomplished in 1977, rather than a year or so later as Borland had intended and as Voting Trustee Simpson testified Borland had advised. Discussions followed between Mr. Borland and at least two potential purchasers, known to this record, at Mr. Rosenblum's offices, after Borland was authorized by the Voting Trust to entertain such conversations. In June of 1977, Rosenblum contacted the chairman of Johnston Industries, Inc., Mr. Paul Johnston, and gave Johnston his first indication that those shares of W & K under control of the Voting Trust were open to purchase. After intensive investigation

of W & K for Johnston by Dr. Irving Obrow and those professional services which were utilized by him, and after numerous conversations and communications between the parties and their agents, Johnston and the Voting Trust executed a letter of intent on July 22, 1977, pursuant to which Johnston would acquire the Voting Trust shares at the price of $120.00 per share. The Agreement was finally negotiated by voting Trustee Simpson on behalf of the Trust, who took charge from Borland of the Johnston transaction. Borland had initially asked Johnston if it would purchase *all* outstanding W & K shares, and that proposition had been rejected by Johnston. No alterations or special arrangements were ever made of the Johnston transaction because of the existence of the plaintiffs herein. The transaction concluded as it had begun: as a purchase of the shares held by the Voting Trust. It is clear, however, that Johnston would not have purchased those shares if it were not confident of obtaining at least 80% of W & K by the subsequent exercise of the options which W & K held for the balance of plaintiffs' shares. The 80% ownership was necessary for the consolidated tax reporting planned by Johnston, and was therefore significant to the purchase. Johnston's reliance upon the validity of plaintiffs' contract, however, was by no means unlawful conduct, or violative of any right plaintiffs had under that contract.

The Johnston acquisition closed on September 29, 1977. Thereafter the former Board of Directors of W & K resigned, and a new Board was elected. On October 4, 1977, written notice of the Johnston purchase was given all shareholders, including the NBD Trust Department. Mr. Driscoll sent copies to Mr. McMath and plaintiff Margaret Herring the next day: and not one of the plaintiffs herein sought to terminate the options as yet unexercised on their stock then, at the later time of their exercise, or at any time prior to the 1979 filing of this lawsuit.

The new W & K Board of Directors voted to, and did, exercise the corporation's options on plaintiffs' stock on October 17, 1977, and the transaction was closed at NBD. W & K paid plaintiffs by certified checks for a total of $1,185,960.00 and promissory notes for $353,000.00 at that time. It is noteworthy that the options in question were on shares in five parcels, of which the options on the last 6,849, at the price of $40.00 per share, need not have been exercised until December 15, 1985. Mr. McMath acknowledged in his testimony, as did Driscoll, that he had been pleased that W & K exercised the options at that time; and that he had been concerned whether the impact of the Johnston transaction on the McMath group might have been W & K's failure to exercise its option rights on their stock.

■ It is clear to this court that none of the information, financial or otherwise, which was furnished to plaintiffs prior to the closing of their Stock Purchase and Option transaction misrepresented the condition of W & K materially or otherwise. Moreover, defendants did not omit to advise of any fact which was necessary to make the information provided other than misleading. Plaintiffs have complained of W & K's failure to forward its "backlog" records to Mr. McMath, from which it is claimed he would have ascertained that his stock was of far greater value than the price at which he sold.

■ That argument, however, will not hold water for several reasons. First, there was not a whit of evidence in plaintiffs' case that the McMath group would have refused to sell their stock to W & K or raised their price, under *any* circumstances. An "exit" was deeply desired, and Mr. McMath acknowledged that he started at the $40.00 asking price (the same price he had asked of Bethlehem) because that was what they "might pay", and that he knew a transaction advantageous to the company must be structured to induce it to participate. Mr. McMath moreover, had been President of this corporation in the very recent past, at the time of the negotiation and consummation of his sale. He knew all data generated by the corporation then, as he does now, and the significance of back-

log data. He did not request any or direct Driscoll so to do, however: because it was not relevant to his efforts at the time, which were to offer sufficient inducements to W & K to be relieved of his position in the corporation. Those inducements included a good price, options exerciseable over the next eight years, and a penalty for failure to do so.

The plaintiffs, moreover, were represented not only by Mr. McMath but by the expertise of the entire Trust Department of NBD, which had found plaintiffs' asking price of $40.00 to be fair and reasonable, not only in their transaction with W & K, but as to plaintiffs' prior option transaction with the Bethlehem Corporation. Driscoll's first written sales effort with W & K clearly establishes, moreover, that the "enhancement" of Voting Trust stock which did in fact later occur was foreseen, predicted, and used as a selling point for W & K's acceptance of plaintiffs' shares.

If, indeed, plaintiffs could have extracted a better bargain from W & K with the benefit of more corporate data, it is only their own lack of due diligence which deprived them of that benefit. Defendants clearly offered, and stood ready to provide, any materials requested.

It further appears to the court, as a matter of fact, that W & K did not structure or arrange the subsequent transaction between the Voting Trust and Johnston Industries; that the language of Paragraph 10 of plaintiffs' agreement was and is plain on its face and that its meaning was not concealed from plaintiffs; that plaintiffs were notified of the Johnston transaction although they were not entitled to such notice, under the terms of their contract; and that none of the defendants have done anything subsequent to execution of plaintiffs' agreement which was violative of the terms of that Agreement.

■■ All of the plaintiffs herein are charged with the knowledge acquired and possessed by Mr. McMath and by NBD, inasmuch as all plaintiffs had granted power of attorney for the purpose of a stock sale to them. The latter two, moreover, are chargeable with all knowledge possessed by Attorney/Director Giles, who was the attorney of record for both McMath estates at all times here relevant. *See Chelsea Associates v. Rapanos,* 527 F.2d 1266 (6th Cir. 1975); and *Dodge v. United States,* 292 F.Supp. 573 (S.D.Fla., 1968), *aff'd* 413 F.2d 1239 (5th Cir., 1969).

■■ On the facts found by this court and outlined above, plaintiffs have failed to establish any of the elements of a violation by any of the defendants herein of 15 U.S.C. § 78j(b) or of 17 CFR ¶ 240.10(b)–(5). The elements necessary to establish a private cause of action under that statute and rule include materiality, scienter, reliance, causation, and damages. None of those have been proved. *See, Kohler v. Kohler Co.,* 319 F.2d 634 (7th Cir., 1963); *Arber v. Essex Wire Corporation,* 490 F.2d 414 (6th Cir., 1974), *cert. denied,* 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974); and *Ernst and Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), *rehearing denied,* 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811. Plaintiffs, moreover, on the facts above found, have clearly failed to exercise the minimal degree of care and due diligence requisite to maintenance of such a claim. *McGraw v. Matthaei,* 388 F.Supp. 84 (E.D.Mich, 1972).

■ Plaintiffs' second claim is that some of the individual defendants, being "control persons" within 15 U.S.C. § 78t(a), are liable to them for the § 10(b) violations claimed above. The court having found now 10(b) or Rule 10(b)(5) violations in this case, however, it cannot find the "control person" liability which is dependent thereon. Moreover, it is clear on the facts that all individuals so charged acted in good faith, and did nothing directly or indirectly to induce these plaintiffs' Stock Purchase and Option Agreement or sales of their stock pursuant thereto. The Voting Trustees, indeed, did not participate in any of the negotiations resulting in plaintiffs' disposal of their stock. *Christoffel v. E.F. Hutton & Co., Inc.,* 588 F.2d 665 (9th Cir., 1978); *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880 (3rd Cir., 1975), and *Carpenter v. Harris, Upham & Co., Inc.,* 594 F.2d 388 (4th Cir., 1979), *cert. denied,* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979).

■ Plaintiffs claim, third, that W & K failed to give them advance notice of the Johnston transaction, and thereby breached their obligation to plaintiffs under the Stock Purchase and Option Agreement. On the facts above, however, it is clear that the Johnston acquisition of Voting Trust shares was not "a sale of a controlling interest in the company in which the shareholders generally" had an entitlement to participate; and therefore that, by the clear and unambiguous language of their contract, W & K need not have provided plaintiffs with any advance notice. The contract was not breached. *Ginsberg v. Reliable Linen Service Co.*, 290 N.W. 331, 292 Mich. 70 (1940).

■ Plaintiffs' claim, fourth, that they would have terminated the option rights of W & K on McMath group shares, and would not have sold their remaining shares to W & K thereafter, had they been given prior notice of the Johnston acquisition. This claim is entirely refuted by the evidence presented by plaintiffs themselves, at trial. First, the court reiterates its conclusion that defendants had no obligation to provide plaintiffs with the advance notice here demanded. But the facts are that plaintiffs were indeed given notice of the Johnston transaction shortly thereafter, and testified that their only concern was of the possibility that their options might *not* be exercised. No protest was made. Thereafter, when W & K offered to exercise all options—including those which it could by contract have held, at the same price, until 1981, 1983, 1984, and 1985—plaintiffs responded with uniform alacrity. This claim is, accordingly, completely discredited by the evidence.

■ Plaintiffs' fifth claim is that defendant Johnston and the defendant Voting Trustees wrongfully induced defendant W & K to breach its Agreement with plaintiffs by failing to provide the above-discussed prior notice. Inasmuch as there was, on the facts, no breach, this claim must also fail.

■ Sixth, plaintiffs claim that defendants Johnston and Voting Trustees "structured" their transaction so as to deprive plaintiffs of the benefits of their Stock Purchase and Option Agreement. On the facts

found above, this claim is clearly without support in the evidence. Also, it is noted that defendants had no duty to structure any transaction which they might conduct in a manner beneficial to plaintiffs. *McDaniel v. Painter*, 418 F.2d 545 (10th Cir., 1969).

■ Plaintiffs claim seventh that their Stock Purchase and Option Agreement must be reformed, because of both the mutual mistake of the parties and the fraudulent concealments of defendants. The reformation requested would permit plaintiffs to now terminate their options. On the facts found above, there was no mutual mistake. If, indeed, there was a mistake at all it was made by attorneys Driscoll, Giles, and Carey on behalf of plaintiffs above, in agreeing to § 10. It is equally clear that there was no fraudulent concealment on the part of any defendant. Moreover, it ill behooves plaintiffs to request such equitable relief as a reformation, in 1981, when they promptly seized upon the opportunity to dispose of their shares in accordance with the Agreement in 1977, knowing all the facts of which they complain, today. *See, Crane v. Smith*, 220 N.W. 750, 243 Mich. 447 (1928); *Holda v. Glick*, 20 N.W.2d 248, 312 Mich. 394 (1945), and *D'Allesandro v. VanderHooning*, 112 N.W.2d 114, 365 Mich. 66 (1961).

■ Eighth, plaintiffs claim to have been the victim of Borland and W & K's commonlaw fraud, in executing their Agreement. The elements of commonlaw fraud in Michigan, which parallel the elements of a § 10(b) claim, and which must be proved by clear and convincing evidence, are completely absent from this record. *Hyma v. Lee*, 60 N.W.2d 920, 338 Mich. 31 (1953).

■ Ninth, plaintiffs claim defendants' breach of a fiduciary duty owed to plaintiffs by structuring the Johnston transaction to the exclusion of plaintiffs' participation. Again, the facts presented by plaintiffs disprove their claim. The law is settled, moreover, that defendants owed no fiduciary duty to plaintiffs in that transaction beyond the terms of the contract which governed their relationship. *Toledo Trust*

*v. Nye,* 588 F.2d 202 (6th Cir., 1978). Moreover, the breach of fiduciary duty claimed by defendants' failure to disclose W & K's actual financial condition, in plaintiffs' tenth claim, has been disproved by the facts presented, as well. The derivative twelfth claim that defendant Johnston wrongfully induced the above-alleged breaches of fiduciary duties must also fall, for failure to establish the predicate breaches.

Finally, plaintiffs' eleventh claim is that the beneficiaries of the Voting Trust were unjustly enriched by and through the Johnston acquisition of their shares. The facts and law discussed above require the dismissal of such a claim.

Accordingly, for all of the reasons outlined above, the Rule 41(b) motion of defendants herein shall be and hereby is GRANTED, and plaintiffs' complaint shall be and hereby is DISMISSED.

IT IS SO ORDERED.