**The CLEVELAND–CLIFFS IRON COMPANY, Plaintiff,**

v.

**CHICAGO & NORTH WESTERN TRANSPORTATION COMPANY, Defendant.**

**No. M81–68 CA2.**

United States District Court, W.D. Michigan, N.D.

March 5, 1984.

Crowell & Moring by Herbert J. Martin, Frederick W. Claybrook, Jr., Mark R. Rosen, Washington, D.C., Warner, Norcross & Judd by William K. Holmes & Joseph G. Scoville, Grand Rapids, Mich., for plaintiff.

Christopher A. Mills, Sr. Commerce Counsel, C & NW, Chicago, Ill., for defendant.

## OPINION RE MOTION FOR SUMMARY JUDGMENT

HILLMAN, District Judge.

This is an action for declaratory and injunctive relief, to enforce a rail tariff agreement between a carrier and a shipper and to enjoin the carrier from charging a higher rate, set forth in a supplemental tariff which was filed with the Interstate Commerce Commission (hereinafter "ICC"). Federal jurisdiction exists under 28 U.S.C. § 1332 and 28 U.S.C. § 1331, the federal question arising under Section 208(a)(i)(2) and (j) of the Staggers Rail Act of 1980, [49 U.S.C. § 10713(i)(2) and (j)]. The case is now before the court on plaintiff's motion for summary judgment. Oral argument on the motion was heard on August 8, 1983.

### I.

The shipper, Cleveland-Cliffs Iron Company ("Cleveland-Cliffs") is the owner or long-term lessee of extensive iron rich properties in the Upper Peninsula of Michigan. Cleveland-Cliffs and groups of steel manufacturers have formed three partnerships which are engaged in the business of mining and pelletizing iron ore from the Republic, Tilden and Empire mines in the Marquette Iron Range. Defendant, Chicago & North Western Transportation Company ("C & NW") is a rail carrier, which, in conjunction with the Lake Superior and Ishpeming Railroad, transports iron ore and pellets from these mines to the port of Escanaba, Michigan.

In 1967, the C & NW began construction of a modern highly-mechanized iron ore storage and transfer facility in Escanaba. This new facility became operational in 1969. The facility has a current capacity to handle 10 million tons of ore annually and a potential capacity of 20 million tons.

In March, 1969, plaintiff and defendant entered into two agreements for the transportation of large amounts of ore and pellets to the Escanaba dock facility at bulk prices. The first of these agreements, the Marquette Range Agreement, provides for the shipment of 1.5 million long tons of ore from the Republic and Tilden mines to the C & NW Escanaba dock. The second agreement, the Empire Agreement, provides for the annual shipment of 2.21 million tons of iron ore from the Empire mine to Escanaba. The rates for these shipments were established by a tariff schedule

incorporated into the agreements and filed with the ICC. The tariff provides for periodic price increases through an acceleration clause. The minimum life of the agreement extends to April 3, 1984, unless the mines permanently cease ore production. Plaintiff contends that a February, 1969, letter from C & NW to Cleveland-Cliffs transmitting the two agreements ("Braun letter"), contains the proposed terms and conditions binding upon the parties.

Cleveland-Cliffs and C & NW have observed the agreements for 12 years. On March 10, 1981, the carrier sought to increase the rail rate by filing a supplemental tariff with the ICC. On March 25, 1981, the shipper filed a complaint with the ICC asking the Commission to suspend the supplemental tariff before its effective date of April 25, 1981. On April 24, 1981, the ICC issued an order stating its intention to investigate the supplemental tariff, but declining to suspend it. On that same day, and after the ICC decision, the shipper filed the instant action seeking a temporary restraining order, a declaration that its contracts with the carrier were valid and binding, and injunctive relief.

The ICC intervened to support the railroad's position that this court lacked subject matter jurisdiction over rate contracts entered into prior to the effective date of the Staggers Act. The court ruled, however, that under section 208 of the Act, 49 U.S.C. § 10713, it had jurisdiction to decide all questions relating to the 1969 contract, except whether the rate provided for in that contract was confiscatory. The court ruled that the ICC retained exclusive jurisdiction over that question.

On May 27, 1981, the court granted the shipper's request for a preliminary injunction enforcing the contract until either the ICC determined whether the contract was confiscatory, or the court reached a decision on the merits. On the same day, the court denied the carrier's motion to dismiss for lack of subject matter jurisdiction. See generally, Cleveland-Cliffs Iron Company v. Chicago & North Western Transportation Company, 516 F.Supp. 399 (W.D. Mich.1981).

On June 8, 1981, the court certified for immediate appeal to the United States Court of Appeals for the Sixth Circuit, the issue of whether the Staggers Act gives the district court jurisdiction to enforce rate agreements entered into prior to the effective date of the Act, where such contracts were not at issue in an ICC proceeding pending on the effective date of the Act. On March 29, 1982, the Court of Appeals, 701 F.2d 175, upheld this court's ruling on the jurisdictional issue, noting that the contracts at issue are no longer subject to reasonableness review by the ICC, and that jurisdiction to enforce such contracts lies in the courts. See also Cleveland-Cliffs Iron Company v. ICC, 664 F.2d 568 (6th Cir.1982).

On December 23, 1981, the ICC completed its investigation, determining that the C & NW's proposed rates were unlawful, and ordered them cancelled. The Commission ordered that all but one contract rate be enforced, and ordered that a rate be negotiated to replace the rate which was not enforced. C & NW agreed to cancel its proposed rates, thus mooting a major portion of this lawsuit.

However, on June 8, 1981, Cleveland-Cliffs filed a First Amended Complaint. The amended complaint differs from the original complaint in that it contains allegations that C & NW breached the 1969 agreement. It is also alleged that during the 1979 shipping season, C & NW charged Cleveland-Cliffs rates in excess of those contained in the Braun letter. Similar violations are alleged for the 1980 shipping season. As a result of those alleged breaches, Cleveland-Cliffs claims that it was injured in the amount of $240,902 for the 1979 season and $244,312 during the 1980 season.

C & NW then filed a motion to dismiss the amended complaint, 553 F.Supp. 371 (W.D.Mich.1982), arguing that under section 229 of the Staggers Act, this court lacked jurisdiction. This court held that where the railroad rates at issue were in

effect on the effective date of the Staggers Act and where the lawfulness of those rates was not challenged in this action, the matter was properly subjected to the jurisdiction of this court. *Id.* at 375. On July 28, 1983, C & NW filed its Amended Answer, in which it raised nine affirmative defenses, and counterclaimed for damages, declaratory relief and reformation of the Marquette Range and Empire Agreements.

The matter is now before the court on plaintiff's motion for summary judgment. Also before the court is defendant's motion to join Lake Superior and Ishpeming Railroad, a signatory to one of the agreements as a co-defendant, under Rule 19.

## II.

On a motion for summary judgment the movant bears the burden of showing conclusively that there is no genuine issue of material fact, and that the moving party is entitled to summary judgment as a matter of law. *Smith v. Hudson,* 600 F.2d 60 (6th Cir.1979); *Tee-Pak, Inc. v. St. Regis Paper Co.,* 491 F.2d 1193 (6th Cir.1974); Fed.R.Civ.P. 56(a). In determining whether there are issues of fact requiring a trial, "the inferences to be drawn from the underlying facts contained in [the affidavits, attached exhibits and depositions] must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). A court may not resolve disputed questions of fact in a summary judgment decision, and if a disputed question of fact remains, the district court should deny the motion, and proceed to trial. *United States v. Articles of Device,* 527 F.2d 1008, 1011 (6th Cir. 1976). However, the fact that two parties to a contract may differ on the interpretation of terms in that contract does not, by itself, render summary judgment inappropriate. *See Steinmetz Electrical Contractors v. Local Union No. 58,* 517 F.Supp. 428, 432 (E.D.Mich.1981). *See also Tennessee Consolidated Coal Co. v. United Mine Workers of America,* 416 F.2d 1192, 1199 (6th Cir.1969); *Freeman v. Continental Gin Co.,* 381 F.2d 459, 465 (5th Cir.1967). The real issue is not whether the parties disagree on the meaning of terms to the contract, but whether the terms themselves are ambiguous. If the contract terms are not ambiguous, then contradictory inferences which may be drawn are subjective, and irrelevant. *Naph-Sol Refining Co. v. Murphy Oil Corp.,* 550 F.Supp. 297, 301–302 (W.D.Mich.1982), *rev'd on other grounds,* 728 F.2d 1477 (T.E.C.A.1983). From the complaint and answer, and the briefs and oral argument on this motion, it is readily apparent that the facts leading up to this dispute are not at issue; the disagreement between the parties centers on the legal effect of those facts. At its heart, this is a contract action, concerning the enforceability of an agreement between the two parties, and the defenses raised by C & NW basically argue that the agreements signed by the parties cannot be enforced for a number of reasons. Cleveland-Cliffs, on the other hand, asks the court for a declaratory judgment that there is a valid contract in force between the two parties.

The remedy made available by the Declaratory Judgment Act and Rule 57 is designed to minimize the danger of avoidable loss and the unnecessary accrual of damages. *Cunningham Bros., Inc. v. Bail,* 407 F.2d 1165, 1168 (7th Cir.), *cert. denied,* 395 U.S. 959, 89 S.Ct. 2100, 23 L.Ed.2d 745 (1968). Its use is discretionary on the part of the court, *Abbott Labs v. Gardner,* 387 U.S. 136, 155, 87 S.Ct. 1507, 1519, 18 L.Ed.2d 681 (1967), and a court may not grant a declaratory judgment if no controversy exists. *See* 28 U.S.C. § 2201. However, there is little difficulty in finding an actual controversy if, as here, all the acts that are alleged to have created liability already have occurred. *Armour & Co. v. Ball,* 468 F.2d 76, 79 (6th Cir.1972).

In determining whether a contract exists, this court will apply Michigan law. Under Michigan law, where the contract is to be performed in a state (here Michigan) other than the state in which the contract is made (Illinois and Ohio), the law of the

state in which the contract is to be performed governs the nature and effect of the contract. *George Realty Co. v. Gulf Refining Co.*, 275 Mich. 442, 266 N.W. 411, 415 (1936).

### III.

C & NW argues that the Marquette and Empire Range Agreements are unenforceable and void as a matter of law. It raises nine affirmative defenses to Cleveland-Cliffs' complaint.

■ First, it claims that the agreements are unenforceable for lack of mutuality, in that C & NW was obligated to charge certain rates, but Cleveland-Cliffs was not obligated to ship any ore. While lack of mutuality of obligation may still be a defense to a contract action in Michigan, *see McInerney v. Detroit Trust Co.*, 279 Mich. 42, 46, 271 N.W. 545 (1937); *Toussaint v. Blue Cross*, 408 Mich. 579, 630, 292 N.W.2d 880 (Ryan, J. concurring); where consideration is present, mutuality of obligation is not an essential element of an enforceable agreement. *Toussaint v. Blue Cross, supra* at 600, 292 N.W.2d 880; *Earl Dubey & Sons v. Macomb Concrete Corp.*, 81 Mich. App. 662, 266 N.W.2d 152 (1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979). *See also* 6 M.L.P. *Contracts* § 7; *Restatement of Contracts* § 79 (1971).

■ C & NW's second affirmative defense, that the agreements are not supported by adequate consideration, is closely related. If the agreements are supported by adequate consideration, then this defense will obviously fail, as will the defense of lack of mutuality of obligation. There is no question that defendant was compensated for its service. Cleveland-Cliffs paid C & NW just as any other shipper would. The defendant claims, however, that the rate which Cleveland-Cliffs is required to pay under the agreement at issue is insufficient to support a finding that a contract exists. While inadequacy of consideration, unaccompanied by other elements of bad faith will warrant the cancellation of a contract where it is "so grossly inadequate as

to shock the conscience," *Wroblewski v. Wroblewski*, 329 Mich. 61, 65, 44 N.W.2d 869, 872 (1950), the general rule is that courts will not inquire into the adequacy of the consideration of a contract. *Kennedy v. Shaw*, 43 Mich. 354, 5 N.W. 415 (1880); *see also Sambo's Restaurants v. City of Ann Arbor*, 473 F.Supp. 41, 45 (E.D.Mich. 1979) (any consideration, however slight, sufficient to support contract). Although the rates set under the two agreements may not be as high as they would be if C & NW was negotiating them today, they are certainly not so low that they produce "an inequality so strong, so gross and manifest that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it." *Lenawee County Bd. of Health v. Messerly*, 98 Mich.App. 478, 295 N.W.2d 903, 908 (1980). Since the consideration for the contract is legally adequate, that defense fails, as does the defense of mutuality of obligation.

■ C & NW's third affirmative defense is that both parties knew the contracts were illegal and unenforceable, and therefore neither party intended to be bound by them. The question of intent to be bound is an issue which was raised in the ICC hearing on these rates. The ICC's December 21, 1981, opinion dealing with those rates states that: "A document with this degree of detail covering all relevant matters and containing language stating specifically that the parties agree to the arrangement, appears on its face to be stating the intent of the parties ..." Rates on Iron Ore to Escanaba, Michigan, Chicago and Northwestern, ICC No. 28566 (December 21, 1981) at 11. I concur. Judge Learned Hand, nearly 75 years ago, put it this way: "If however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon him, he would still be held...." *Hotchkiss v. National City Bank of New York*, 200 F. 287, 293 (S.D.N.Y.1911). C & NW and Cleveland-Cliffs reduced their agreement to writing. This

writing is capable of interpretation under recognized rules of law. If a contract exists, neither party may avoid the consequences of it by stating that such was not its subjective understanding of the meaning to be given to the language used.

The alleged illegality of the contract appears to rest on the presumption that since the ICC was the government body responsible for setting rates at the time the agreements were signed, the parties could not legally make a rate agreement. The Sixth and Eighth Circuits have both held that railroad rate contracts entered into prior to the Staggers Act are not per se illegal. *Cleveland Cliffs Iron Co. v. ICC*, 664 F.2d 568, 574 (6th Cir.1981); *Iowa Power & Light Co. v. Burlington N., Inc.*, 647 F.2d 796, 808 (8th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982). In a similar situation, where a trucking company raised the possible illegality of a rate agreement it had signed with a shipper, the Michigan Supreme Court ruled that shippers and carriers entering into rate agreements "shall be deemed to have made the kind and character of contract permitted by the statute regulating such transaction." *Robert McDaniel Trucking Co. v. Oak Construction Co.*, 359 Mich. 494, 511, 102 N.W.2d 575 (1960).

■■ The language of 49 U.S.C. § 10713 emphasizes the current enforceability of rate contracts made prior to the Staggers Act.

"The provisions of this section shall not affect the status of any lawful contract between a rail carrier and one or more purchasers of rail service that is in effect on the effective date of the Staggers Rail Act of 1980. Any such contract shall hereafter have the same force and effect as if it had been entered into in accordance with the provisions of this section."

49 U.S.C. § 10713(j). Even assuming that the agreements were illegal when made, the language of the Staggers Act makes it clear that C & NW cannot now raise that illegality as an affirmative defense to the existence of a contract. As Justice Black,

writing for the Court in *McNair v. Knott*, 302 U.S. 369, 58 S.Ct. 245, 82 L.Ed. 307 (1931), noted in an analogous context:

"There is nothing novel or extraordinary in the passage of laws by the Federal Government and the States ratifying, confirming, validating, or curing defective contracts. Such statutes, usually designated as 'remedial,' 'curative,' or 'enabling,' merely remove legal obstacles and permit parties to carry out their contracts according to their own desires and intentions. Such statutes have validated transactions that were previously illegal relating to mortgages, deeds, bonds, and other contracts. Placing the stamp of legality on a contract voluntarily and fairly entered into by parties for their mutual advantage takes nothing away from either of them. No party who has made an illegal contract has a right to insist that it remain permanently illegal. Public policy cannot be made static by those who, for reasons of their own, make contracts beyond their legal powers. No person has a vested right to be permitted to evade contracts which he has illegally made."

*Id.* at 372–373, 58 S.Ct. at 247. Thus, as a matter of state and federal law, the agreements were and are legal.

■■ C & NW raises the defenses of impracticability, frustration of purpose and mutual mistake of fact. However, Michigan law recognizes impracticability only as a defense to an action for breach of a sales contract under the Uniform Commercial Code. *See* M.C.L.A. § 440.2615. In other situations, such as the agreement at issue here, the fact that subsequent market conditions render a contract unprofitable will not excuse performance. *Milligan v. Haggerty*, 296 Mich. 62, 71, 295 N.W. 560 (1941); *see also Stotts v. Memphis Fire Dept.*, 679 F.2d 541, 561 (6th Cir.1982).

■■ C & NW argues that passage of the Staggers Act, which limits ICC jurisdiction to provide relief from non-compensable rate contracts, frustrates the purpose of the agreements and thus leads to a mutual mistake of fact (that ICC jurisdiction would

never change). It is difficult to understand how a statute affecting the procedure for enforcement of rate contracts, and not their substance, frustrates the purpose of those contracts. The Staggers Act obviously does not prohibit the mining or shipping of iron ore. Therefore, the frustration of purpose doctrine defense is inapplicable here.

■■■■■ The case of *Sherwood v. Walker*, 66 Mich. 568, 33 N.W. 919 (1887), the leading case on mutual mistake of fact, makes it clear that the doctrine applies only to mistakes of fact existing at the time the contract was made, and not subsequent developments. In that famous case, defendant sold plaintiff a cow, Rose 2d of Aberlone. Both parties thought the cow was barren. Defendant subsequently learned that the cow was pregnant, and refused to tender the cow to plaintiff. Plaintiff sued for enforcement of the contract. The Michigan Supreme Court held that the contract was for the sale of a barren cow, and since Rose was not barren, there was a mutual mistake of fact. Rose of Aberlone was pregnant when she was sold, but the Staggers Act did not come into existence until more than a decade after the agreements here were signed. C & NW alleges no mistake concerning facts in existence at the time the agreements were signed in February and March 1969, and hence the defense does not apply to the instant case.[1] Finally, C & NW argues that Cleveland-Cliffs is barred from relief by section 229 of the Staggers Act. C & NW raised this same issue in its motion to dismiss. *See Cleveland-Cliffs Iron v. Chicago & North Western*, 553 F.Supp. 371 (W.D.Mich.1982). This court ruled then that section 229 does not bar the instant action, and having so ruled, the court rejects C & NW's section 229 defense.

Having examined the agreements, and considered and rejected C & NW's affirmative defenses concerning the existence of a contract, I conclude that there is indeed a valid, enforceable contract for transporting iron ore in existence between C & NW and Cleveland Cliffs. The remaining discussion concerns the terms of the contract, and whether either party is in breach of that contract.

## IV.

■■■■ C & NW claims that, even if the agreements constitute a contract, the area known as the Tilden Mine is not included in the mines covered by the Marquette Range Agreement. Nevertheless, the Marquette Range Agreement itself, statements of C & NW employees before the ICC, and C & NW internal memoranda all include the Tilden Mine within the Marquette Range Agreement. Moreover, the Tilden Mine has been included in the tariff since shipments began from the Tilden Mine. In addition, the Tilden tonnage has always been counted by the parties in determining whether the volume minimums were met under the Marquette Range Agreement and the incorporated tariff. If indeed the Tilden Mine was not to have been included in the Marquette Range Agreement, the issue should have been raised at the outset of the agreement. C & NW's failure to do so estops them from raising it at this late date—after having acquiesced in the inclusion of the Tilden Mine for more than a decade. *See Wheat v. Van Tine*, 149 Mich. 314, 112 N.W. 933 (1907). Therefore, I am satisfied that the Tilden Mine is included in the Marquette Range Agreement.

## BREACH

Cleveland-Cliffs, in its amended complaint, and C & NW in its answer and counterclaim, both charge that the other

---

**1.** Since there was no mutual mistake of fact, the court must also reject C & NW's request for reformation of the agreements. While a court, in its equity power may reform a contract, such reformation is dependent on a mutual mistake or fraudulent concealment. *National Bank of Detroit v. Whitehead & Kales Co.*, 528 F.Supp.

940, 950 (E.D.Mich.1981); *Fred L. Alpert Industries v. Oakland Metal Stamping Co.*, 379 Mich. 272, 285, 150 N.W.2d 765 (1967). Since C & NW has alleged no fraud, and there was no mutual mistake of fact at the time the agreements were signed, this court has no power to reform the agreements.

party is in breach of the agreements. Cleveland-Cliffs alleges that during the 1979 and 1980 shipping seasons, C & NW charged rates in excess of those contained in the agreements, and claims damages as a result of the alleged breach. In addition, Cleveland-Cliffs argues that C & NW breached by filing a supplemental tariff. C & NW contends that Cleveland-Cliffs breached the agreements in two ways. First, C & NW argues that Cleveland-Cliffs was obligated to provide C & NW with estimates of the amount of iron ore it intended to ship, and to revise those estimates on a monthly basis if need be. C & NW alleges that in 1980 and 1982 Cleveland-Cliffs provided C & NW with estimates it knew to be erroneous, and therefore, Cleveland-Cliffs is in breach. Second, C & NW contends that the agreements require Cleveland-Cliffs to ship certain minimum amounts, which it failed to do, and as a result, Cleveland-Cliffs is in breach. C & NW further contends that since Cleveland-Cliffs has breached, C & NW is no longer obligated to perform under the contracts, and seeks damages as a result of the alleged breach.

Under Michigan law, to allow repudiation or rescission, a breach must be material. *Walker & Company v. Harrison*, 347 Mich. 630, 81 N.W.2d 352, 355 (1957). While there is no single definition of materiality, the factors to be considered include the extent to which the injured party will obtain the substantial benefit which he reasonably anticipated, the extent to which the injured party may be adequately compensated in damages, the extent of partial performance, the relative hardship on the parties, and the bad faith of the breaching party. *Id.* 355. In addition, a party may waive their right to rescind a contract for breach by accepting continued performance even though the party may still have a right to damages. *Schnepf v. McNamara*, 354 Mich. 393, 93 N.W.2d 230, 232 (1958). Here, where both parties have continued substantial performance, that is the supplying of iron ore for transport, and the transportation of that ore, any breach is less than material, and

the parties are limited to recovering damages they have suffered, if any.

## DAMAGES

Cleveland-Cliffs, in addition to requesting a declaratory judgment as to the existence of a contract, has also requested damages for alleged overcharges by C & NW in the 1979 and 1980 shipping seasons. Cleveland-Cliffs alleges that during those two seasons, it shipped sufficient tonnage to qualify under the agreement for a lower base rate than that charged by C & NW. As a result, the shipper argues it was overcharged $240,902 in 1979 and $244,312 in 1980. It is clear that a letter to the C & NW, dated February 4, 1969, establishes a variable rate, dependent upon the amount shipped. Before deciding the amount of damages, if any, the court requests the parties to submit affidavits, where appropriate, and a stipulation covering all essential facts not in dispute, such as the variable rates in effect, and detailing the amount actually shipped during the shipping seasons in question. This stipulation and affidavits should be filed within sixty (60) days.

As noted earlier, C & NW's claim for damages is three pronged: (a) that Cleveland-Cliffs had an obligation to adjust throughout the year its designated annual volumes, which obligation it breached; (b) that Cleveland-Cliffs did not achieve the 2.5 million-ton level specified in the contracts in the 1981–82 tariff year; and (c) that Cleveland-Cliffs had an obligation to ship tonnage each month within a zone of six to fifteen percent of its annual estimate, and any shipments outside that zone should have been charged at higher, single-car rates. A careful examination of the record reveals that, on the undisputed facts, Cleveland-Cliffs did not breach any duty owed C & NW.

First, neither the agreements themselves, nor the memoranda and affidavits submitted in support, reveal any obligation on the part of Cleveland-Cliffs to revise its annual estimate during the year.

Rather the agreements detail C & NW's remedies should Cleveland-Cliffs ship less than the estimated amounts. In that event, any undercharges were billed to Cleveland-Cliffs at the end of the tariff year. Second Affidavit of Alex R. Rankine at ¶¶ 3, 4. Therefore, C & NW's remedy here was payment for undercharges, not revised estimates; and Cleveland-Cliffs is under no duty to revise its annual estimate throughout the year.

■■■■ Second, Cleveland-Cliffs contends, and C & NW does not dispute, that Cleveland-Cliffs' failure to ship 2.5 million tons in the 1981–82 shipping season is due to C & NW's closing its docks on December 20, 1981. If C & NW had not shut down its docks, Cleveland-Cliffs would have been able to ship iron ore to Escanaba and in late December or early January, 1982, the total shipment for the tariff year would have exceeded 2.5 million tons. Cleveland-Cliffs tendered tonnage in March and April, 1982, which C & NW was not able to accept because C & NW had not resumed operations, and cars were not available. Under the agreement and tariff, if railroad equipment is unavailable, Cleveland-Cliffs was due "disability" credits, i.e. credit for ore which would have been shipped had C & NW had the equipment to ship it. Cleveland-Cliffs was entitled to disability credits, which when added to the amounts actually shipped would have met the 2.5 million ton level. Affidavit of Alex R. Rankine at ¶ 8. Even without the disability credit formula, C & NW's refusal to receive ore which Cleveland-Cliffs was prepared to ship, waived any right to claim that Cleveland-Cliffs did not meet the 2.5 million ton level, *see Apponi v. Sunshine Biscuits, Inc.,* 652 F.2d 643, 649 (6th Cir.1981), and is, therefore, estopped from attempting to collect additional amounts. *Ott v. Midland-Ross Corp.,* 600 F.2d 24, 31–32 (6th Cir.1979).

■■■■ Third, C & NW, apparently in reliance on a letter written prior to the agreements, argues that Cleveland-Cliffs was under an obligation to ship tonnage each month within a range of 6% to 15% of the annual estimate. The language of the agreements themselves state that the railroad(s) agree to furnish transportation sufficient "to transport not less than 6 percent per month nor more than 15% per month of such volume of iron ore as is designated at the beginning of or subsequently during each annual period...." Empire and Marquette Range Agreement, at ¶ 2. The best interpretation of this language obligates the railroad to transport that amount of ore per month, but places no affirmative obligation on Cleveland-Cliffs to supply ore within 6 to 15 percent. By the same token, C & NW has no obligation to transport tonnages in excess of the contracted for 15%. However, C & NW has waived damages for ore which it moved in the past outside the 6% to 15% range. For 12 years C & NW acquiesced in the periodic monthly shipment of ore in excess of the contractual 15%. (See Defendant's Answer to Plaintiff's Interrogatories, Set 1, ¶ 20(a)(7).) As a result, that alleged damage must be denied. *See Schnepf, supra.*

C & NW has also asked the court to declare that the contracts do not "provide for or contemplate any capital expenditures for replacement or addition of equipment ... at Escanaba." However, Cleveland-Cliffs has not raised any issue relating to construction or capital expenditure in its pleadings, nor does there appear to be any mention of a requirement that C & NW make any capital expenditures in the agreements. Since there is no apparent controversy, this court lacks jurisdiction to grant relief. *Flast v. Cohen,* 392 U.S. 83, 95–97, 88 S.Ct. 1942, 1950–1951, 20 L.Ed.2d 947 (1968).

### V.

■■■■ As noted earlier, defendants have moved to join Lake Superior and Ishpeming Railroad ("LS & I") as a necessary party defendant under Rule 19. Without joinder, C & NW asserts, the court cannot grant complete relief. LS & I is a signatory to the Marquette Range Agreement. It has not challenged the validity of that agreement, nor has either party to the instant action alleged that LS & I has breach-

ed the contract. C & NW's analysis is apparently based in part on the assumption that, if this court were to reform the contracts, LS & I, as a signatory to one of the agreements, would be a necessary party to any reformation. Since I have already ruled that the court has no equitable power to reform the contract, C & NW's analysis must fail. Rule 19(a)(1) provides that a party shall be joined if feasible where its absence precludes "complete relief among those *already* parties." (Emphasis added.) "Complete relief refers to relief as between the persons already parties, not as between a party and the absent person whose joinder is sought...." 3A Moore's *Federal Practice,* ¶¶ 19.07–1[1] at 19–128; *see also Morgan Guaranty Trust Co. v. Martin,* 466 F.2d 593, 598 (7th Cir.1972). C & NW is the only party which disputes the enforceability of the agreements, and C & NW is the only party against which Cleveland-Cliffs has claimed damages. I therefore conclude that LS & I is not a necessary party to this action, and defendant's motion is denied.

■■■■■ Plaintiff has requested that it be awarded attorney fees in this action. The general rule is that attorney fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing for their award. *Fleischmann Distilling Co. v. Maier Brewing Co.,* 386 U.S. 714, 717, 87 S.Ct. 1404, 1406, 18 L.Ed.2d 475 (1967). There was no contractual provision concerning attorney's fees in this case. Plaintiff has alleged no facts which would support a finding that defendant acted in bad faith, *Huecker v. Milburn,* 538 F.2d 1241, 1246 (6th Cir.1976), or that an award for attorney's fees would be "in the interest of justice." *Grinnell Bros. v. Touche Ross & Co.,* 655 F.2d 725, 726 (6th Cir. 1981). Accordingly, plaintiff's request for attorney's fees is denied.

## CONCLUSION

Plaintiff's motion for summary judgment is granted. I find that the Marquette Range and Empire Agreements, along with the February, 1969, letter of transmittal constitute a valid contract between the parties.

The parties will submit, within sixty (60) days, a stipulation and affidavits on the issue of damages for overcharges in 1979–1980.