**KARL WENDT FARM EQUIPMENT CO., INC., Plaintiff–Appellant, Cross–Appellee,**

v.

**INTERNATIONAL HARVESTER CO. and International Harvester Credit Corp., Defendants–Appellees, Cross–Appellants.**

Nos. 89–2057, 89–2100.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 10, 1990.

Decided April 26, 1991.

Rehearing Denied May 21, 1991.

Jerald R. Lovell (argued), Mount Clemens, Mich., for Karl Wendt Farm Equipment.

Robert A. DuPuy (argued), James T. McKeown, Mary K. Braza, Foley & Lardner, Milwaukee, Mich., International Harvester Co. and it's successor, International Harvester Credit Corp.

Before JONES, RYAN and BOGGS, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Plaintiff Karl Wendt Farm Equipment Company ("Wendt") appeals and defendants International Harvester Company and International Harvester Credit Corp. (collectively "IH") cross-appeal from a deficiency judgement and preceding trial verdicts in this contract action relating to a dealer sales and service agreement. For the reasons set forth below, we reverse and remand in part and affirm in part.

I.

This diversity action arises out of IH's decision to go out of the farm equipment business after a dramatic downturn in the market for farm equipment. In the fall of 1974, Wendt and IH entered into a "Dealer Sales and Service Agreement" ("agreement") which established Wendt as a dealer of IH goods in the area of Marlette, Michigan. The agreement set forth the required method of sale, provisions for the purchase and servicing of goods, as well as certain dealer operating requirements. The agreement also provided specific provisions for the termination of the contract upon the occurrence of certain specified conditions.

In light of a dramatic recession in the farm equipment market, and substantial losses on the part of IH, IH negotiated an agreement with J.I. Case Co. and Tenneco Inc. ("Case/Tenneco") to sell its farm equipment division to Case/Tenneco. The sale took the form of a sale of assets. The base purchase price was $246,700,000.00 in cash and $161,300,000.00 to be paid in participating preferred stock in Tenneco.

While IH asserts that it lost $479,000,000.00 on the deal, it also noted that this was a "paper loss" which will result in a tax credit offsetting the loss. J.App. at 405.[1]

In its purchase of IH's farm equipment division, Case/Tenneco did not acquire IH's existing franchise network. Rather, it received "access" to IH dealers, many of whom eventually received a Case franchise. However, there were some 400 "conflicted areas" in which both a Case and an IH dealership were located. In these areas Case offered only one franchise contract. In nearly two-thirds of the conflicted areas, the IH dealer received the franchise. However, Marlette, Michigan was such a "conflicted area" and Wendt was not offered a Case franchise.

Wendt filed this action alleging breach of IH's Dealer Agreement and several other causes of action, but all Wendt's allegations save the breach of contract action were disposed of before trial. IH filed a counter-claim against Wendt for debts arising out of farm equipment and parts advanced to Wendt on credit.

At trial, the court allowed IH's defense of impracticability of performance to go to the jury on the contract action. The jury returned a verdict of no cause of action on the contract and the district court denied Wendt's motion for J.N.O.V./new trial, which was based on the invalidity of the impracticability defense. These actions by the court form a substantial basis of Wendt's appeal. In addition, however, the court ordered a directed verdict for Wendt as to IH's defenses of frustration of purpose, an implied covenant limiting the duration of the contract and a defense relating to whether Section 2 of the agreement permitted IH to cease production of all its product lines. The court's directed verdict on the viability of these defenses forms the basis of IH's cross-appeal.

After trial the court issued an order dated April 1, 1988, stating that based upon evidence produced at trial, Wendt was in-

---

1. The record contains conflicting figures as to the amount of the "loss." For the purposes of this opinion, we will accept the figure of $479,000,000.00. *But see,* J.App. at 412–13 (quoting the amount of the loss as $497,000,000.00).

debted to IH in the amount of $253,839.69 on IH's counter-claim. The order required that Wendt turn over certain of its inventory in farm equipment and parts to IH, including four tractors which had been mistakenly delivered to Wendt. The order also required that after the equipment and parts were disposed of in a "commercially reasonable manner" by IH, the parties should return to the court to report any surplus or deficiency on the debt. *See* J.App. 56–57.

When IH attempted to collect the equipment and parts pursuant to the April 1 order, Wendt refused to tender the goods until the court determined whether it was entitled to a credit pursuant to the repurchase provisions of the Michigan Farm and Utility Equipment Franchise Act, Mich. Comp.Laws Ann. § 445.1451 *et seq.* (1989) ("Farm Act"). On October 4, 1988, IH moved for an order finding Wendt in contempt for defying the April 1 order. In ruling on that motion the district court determined that the Farm Act had no relevance to the appropriateness of enforcing the replevin order, but was relevant to the calculation of any deficiency judgment due to the defendant. The court affirmed its April 1 order and ordered return of the goods. J.App. 185–87.

In November 1988, IH received the equipment from Wendt and after selling it, asked the court for a deficiency judgment. Wendt objected to the sale of the equipment as not having been conducted in a "commercially reasonable manner" but did not specifically raise the provisions of the Farm Act. Instead, Wendt asserted the proper amount of the deficiency was $180,-379.21 rather than a higher figure claimed by IH. J.App. 207. Later the parties stipulated the amount of the deficiency at $180,379.21, as suggested by Wendt. On August 18, 1989, the court entered a judgment in that amount. Wendt appeals from the judgment claiming that the court erred in not applying the provisions of the Farm Act in determining damages on IH's counter-claims.

## II.

We review the trial court's interpretation of a contract *de novo. Davis v. Sears, Roebuck & Co.,* 873 F.2d 888, 893 (6th Cir.1989). In a diversity action, we must apply state law in reviewing whether the district court properly applied the standards for a J.N.O.V. and a directed verdict. *Rhea v. Massey–Ferguson, Inc.,* 767 F.2d 266, 269 (6th Cir.1985). Under Michigan law, a directed verdict is appropriate only if, viewing the evidence in the light most favorable to the non-moving party, all reasonable persons would agree that there had been "an essential failure of proof." *Snider v. Bob Thibodeau Ford,* 42 Mich.App. 708, 712, 202 N.W.2d 727, 730 (1972). The test for determining whether a J.N.O.V. should be granted is whether the evidence is insufficient as a matter of law to support the judgment. *See Basic Food Industries v. Grant,* 107 Mich.App. 685, 695, 310 N.W.2d 26, 30–31 (1981) (quoting *Sabraw v. Michigan Millers Mut. Ins. Co.,* 87 Mich. App. 568, 571, 274 N.W.2d 838, 840 (1978)).

By contrast, this court is to apply federal law in determining whether the trial court properly denied a motion for new trial. *D.R.C.D.T., Inc. v. Integrity Insurance Co.,* 816 F.2d 273, 276 (6th Cir.1987). A court should grant a motion for new trial if it is convinced that the verdict is against the clear weight of the evidence. *Bruner v. Dunaway,* 684 F.2d 422, 425 (6th Cir. 1982), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983). A judge's decision on a motion for new trial will not be reversed absent abuse of discretion. *Id.*

Wendt asserts a number of errors surrounding the district court's allowing the defense of impracticability of performance to go to the jury. Wendt first contends that the defense of impracticability due to extreme changes in market conditions is not a cognizable defense under Michigan law. In the alternative, Wendt argues that there was insufficient evidence to withstand Wendt's motion for a directed verdict on impracticability. The jury's verdict of no cause of action against IH based on the impracticability defense also forms the ba-

sis of Wendt's motions for J.N.O.V. and new trial.

To determine whether the doctrine of impracticability is applicable under Michigan law based on the circumstances presented in this case, the court must first look to any controlling decisions of the Michigan Supreme Court. *Angelotta v. American Broadcasting Corp.*, 820 F.2d 806, 807 (6th Cir.1987). If the Supreme Court has not spoken on a particular issue, the court must "ascertain from all available data what the state law is and apply it." *Bailey v. V. & O. Press Co*, 770 F.2d 601, 604 (6th Cir.1985) (citations omitted). As this court recognized in *Angelotta*, "the 'available data' to be considered if the highest court has not spoken include relevant dicta from the state supreme court, decisional law of the appellate courts, restatements of law, law review commentaries, and the 'majority rule' among other states." *Angelotta*, 820 F.2d at 807 (quoting *Bailey*, 770 F.2d at 604).

Wendt first contends that impracticability is only cognizable under Michigan law as a defense to contracts for sale of goods governed by the U.C.C. For this contention, Wendt cites *Cleveland–Cliffs Iron Co. v. Chicago & Northwestern Trans. Co.*, 581 F.Supp. 1144, 1151 (W.D.Mich. 1984) which suggested that the defenses of frustration of purpose and impracticability were only available as defense to an action under Mich.Comp.Laws Ann. § 440.2615 (a provision of Michigan's U.C.C.), and were not available in situations where a party alleged that the contract had become unprofitable due to a change in market conditions.

The district court found that *Cleveland–Cliffs* incorrectly stated Michigan law. The court asserted that the Michigan Supreme Court's recognition of the doctrine of impossibility was not altered by its adoption of the U.C.C. in 1964 and further that the doctrine of impossibility was broadened by the Michigan Court of Appeals in *Bissell v. L.W. Edison Co.*, 9 Mich.App. 276, 156 N.W.2d 623 (1967) to excuse future performance when circumstances make

performance impracticable. *See* J.App. at 44. Thus, as the district court put it,

> The relevant question is not whether the doctrine of impossibility as defined by the Michigan Supreme Court in *Sheldon–Seatz, Inc. v. Coles*, 319 Mich. 401, 408, 29 N.W.2d 832 (1947); *Milligan v. Haggerty*, 296 Mich. 62, 70–71, 295 N.W. 560 (1941); and *Chase v. Clinton Cty.*, 241 Mich. 478, 484, 217 N.W. 565 (1928), remains valid.... [Rather,] [t]he only issue in dispute is whether the Michigan Supreme Court would adopt the doctrine of *impracticability* of performance embraced by the Court of Appeals in *Bissell* in light of its teaching in *Sheldon, Milligan,* and *Chase* concerning the doctrine of *impossibility* of performance.

J.App. 44–45 (emphasis original). We find that the district court properly framed the question presented here.

Generally, under Michigan law, "[e]conomic unprofitableness [sic] is not the equivalent to impossibility of performance. Subsequent events which in the nature of things do not render performance impossible, but only render it more difficult, burdensome, or expensive, will not operate to relieve [a party of its contractual obligations]." *Chase*, 241 Mich. at 484, 217 N.W. at 567. *See, also Milligan* 296 Mich. at 71, 295 N.W. at 563, and *Sheldon*, 319 Mich. at 408, 29 N.W.2d at 835.

In *Bissell*, the Michigan Court of Appeals, relying on the Restatement of Contracts section 457, concluded that the doctrine of impossibility is a valid defense not only when performance is impossible, but also when supervening circumstances make performance impracticable. Section 457 of the Restatement of Contracts, now section 261 of the Restatement (Second) of Contracts (1981) provides:

> Discharge by Supervening Impracticability
>
> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the lan-

guage or the circumstances indicate the contrary.

Although *Bissell* did not involve non-performance due to economic causes, the court relied extensively on section 457 which defines impossibility to include, "not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury and loss involved." *Bissell*, 9 Mich.App. at 285, 156 N.W.2d at 626. In the instant case the district court relied heavily on the language of section 457 quoted in *Bissell* to conclude that the extreme downturn in the market for farm products was "unreasonable and extreme" enough to present a jury question as to the defense under Michigan law. *See* J.App. at 47.

Recognizing that *Bissell* suggests that an impracticability defense may be cognizable under Michigan law in some circumstances, we must turn to the question of whether under Michigan law, the defense of impracticability was appropriately presented to the jury under the circumstances involving a dramatic downturn in the market for farm equipment which led to the contract action before us in this case. The commentary to section 261 of the Restatement (Second) provides extensive guidance for determining when economic circumstances are sufficient to render performance impracticable. Comment d to section 261 makes clear that mere lack of profit under the contract is insufficient: " '[I]mpracticability' means more than 'impracticality.' A mere change in the degree of difficulty or expense due to such causes as increased wages, prices of raw materials or costs of construction, unless well beyond the normal range, does not amount to impracticability since it is this sort of risk that a fixed price contract is intended to cover." Comment d also provides:

A severe shortage of raw materials or of supplies due to war, embargo, local crop failure, unforeseen shutdown of major sources of supply, or the like, which either causes a marked increase in cost or prevents performance altogether may bring the case within the rule stated in this Section.

More guidance is provided in Comment b to section 261. Comment b states: "In order for a supervening event to discharge a duty under this Section, the non-occurrence of that event must have been a 'basic assumption' on which both parties made the contract." Comment b goes on to provide that the application of the "basic assumption" criteria

is also simple enough in the cases of market shifts or the financial inability of one of the parties. The continuation of existing market conditions and of the financial situation of one of the parties are ordinarily *not* such assumptions, so that mere market shifts or financial inability do not usually effect discharge under the rule stated in this Section.

(Emphasis added). Comment b also provides two helpful examples. In Illustration 3 of comment b, A contracts to employ B for two years at a set salary. After one year a government regulation makes A's business unprofitable and he fires B. A's duty to employ B is not discharged due to impracticability and A is liable for breach. In Illustration 4, A contracts to sell B a machine to be delivered by a certain date. Due to a suit by a creditor, all of A's assets are placed in receivership. A is not excused for non-performance under the doctrine of impracticability.

■ In our view, section 261 requires a finding that impracticability is an inappropriate defense in this case. The fact that IH experienced a dramatic downturn in the farm equipment market and decided to go out of the business does not excuse its unilateral termination of its dealership agreements due to impracticability. IH argues that while mere unprofitability should not excuse performance, the substantial losses and dramatic market shift in the farm equipment market between 1980 and 1985 warrant the special application of the defense in this case. IH cites losses of over $2,000,000.00 per day and a drop in the company's standing on the Fortune 500 list from 27 to 104. IH Brief at 7 (citing trial record). IH also put on evidence that if it had not sold its farm equipment division, it might have had to declare bankruptcy. While the facts suggest that IH suf-

fered severely from the downturn in the farm equipment market, neither market shifts nor the financial inability of one of the parties changes the basic assumptions of the contract such that it may be excused under the doctrine of impracticability. Restatement (Second) of Contracts, section 261, comment b. To hold otherwise would not fulfill the likely understanding of the parties as to the apportionment of risk under the contract. The agreement provides in some detail the procedure and conditions for termination. IH may not have been entirely responsible for the economic downturn in the company, but it was responsible for its chosen remedy: to sell its farm equipment assets. An alternative would have been to terminate its Dealer Agreements by mutual assent under the termination provisions of the contract and share the proceeds of the sale of assets to Case/Tenneco with its dealers. Thus, we find that IH had alternatives which could have precluded unilateral termination of the contract. Further, application of the impracticability defense in this case would allow IH to avoid its liability under franchise agreements, allow Case/Tenneco to pick up only those dealerships its sees fit and leave the remaining dealers bankrupt. In such circumstance, application of the doctrine of impracticability would not only be a misapplication of law, but a windfall for IH at the expense of the dealers.

We find this understanding of the doctrine of impracticability to be more consistent with Michigan law than the district court's interpretation. In applying the doctrine of impossibility, the Michigan Supreme Court has repeatedly held that economic loss or hardship was not enough to excuse performance. *See Sheldon,* 319 Mich. at 408, 29 N.W.2d at 835 (a government regulation which placed a ceiling on the price of scooter bikes making their manufacture unprofitable did not excuse performance on a contract for sale of scooter bikes); *Chase,* 241 Mich. at 484, 217 N.W. at 567 (increased labor, materials and construction costs due to the unexpected economic hardship brought on by World War I did not excuse performance even when performance cost some 40% more

than the contract price); and *Milligan,* 296 Mich. at 71, 295 N.W. at 563 (market conditions which made the manufacture of bricks unprofitable did not excuse performance). As recently as 1986, this principle was recognized by the Michigan Court of Appeals in *In the Matter of Yeager Bridge Culvert Co.,* 150 Mich.App. 386, 398, 389 N.W.2d 99, 104 (1986) (mere changes in market conditions which render performance unprofitable do not justify releasing a party from its obligation to perform). The fact that IH's losses in this case involved millions of dollars does not change the scope of the doctrine as the proportional effect of those changes is equivalent to the hardship imposed on the small businesses in the impossibility cases just described.

In the end, IH simply asserts that it would have been unprofitable to terminate its agreements with its dealers by invoking the six-month notice and other termination procedures embodied in the Dealer Agreement, or by sharing the proceeds of its sale of its farm equipment assets with dealers. This assertion does not excuse IH's performance under the agreement.

As *Bissell* did not address the question of economic circumstances which excuse performance under the doctrine of impracticability and neither the case law of the Supreme Court of Michigan nor the Restatement (Second) of Contracts suggests that the economic circumstances in this case would be sufficient to excuse performance, we hold that while the Supreme Court of Michigan might recognize the defense of impracticability, it would not do so in the circumstances of this case as a matter of law. Accordingly, we find that the district court erred in permitting the defense of impracticability to go to the jury and that Wendt was entitled to a directed verdict on this issue as a matter of law.

### III.

In its cross-appeal, IH asserts that the court improperly granted a directed verdict for Wendt on its other affirmative defenses. Specifically, IH objects to the court's grant of a directed verdict on IH's defense of frustration of purpose, its defense based

upon Section 2 of the Dealer Agreement and its defense based upon an implied covenant that the contract was not perpetual. We will address IH's defenses *seriatim.*

### A. Frustration of Purpose.

It is undisputed that Michigan law recognizes the defense of frustration of purpose. *See Molnar v. Molnar,* 110 Mich.App. 622, 625–26, 313 N.W.2d 171, 173 (1981) (allowing the defense of frustration of purpose in a suit to discontinue child support payments when the beneficiary child died). However, the district court in the instant case determined that the defense was unavailable. In making this determination, the court relied on section 265 of the Restatement (Second) of Contracts which provides:

Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

In interpreting this provision, the district court relied on the Supreme Court of South Dakota's analysis of this same defense when raised by IH in a suit by a dealer for breach of the same dealer agreement in *Groseth Int'l. v. Tenneco,* 410 N.W.2d 159 (S.D.1987).

In *Groseth,* the court found that under the Restatement (Second), the defense of frustration requires the establishment of three factors. The first is that the purpose frustrated by the supervening event must have been the "principal purpose" of the party making the contract. Quoting section 265, comment a, the court noted, " 'It is not enough that [the contracting party] had in mind a specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense.' " *Id.* at 165. The court interpreted this passage to require an inquiry into the principal purpose of the contract and a finding that the frustrating event destroys the primary basis of the contract. *Id.*

According to the *Groseth* court, the second factor required under the Restatement is that the frustration be "substantial". Once again quoting comment a to section 265, the court stated: " 'It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract.' " *Id.* The court added, "[t]he fact that performance has become economically burdensome or unattractive is not sufficient to excuse performance." *Id.* (citations omitted).

Finally, according to *Groseth,* the third factor required to make out a defense of frustration under the Restatement is that the frustrating event must have been a "basic assumption" of the contract. *See* Restatement (Second) of Contracts, section 265 comment a. In analyzing this element, comment a states that the analysis is the same as under the defense of impracticability. *Id.* (referencing section 261, comment b) (quoted at p. 1117, supra.).

Applying these three factors in the instant case, the district court found that the primary purpose of the Dealer Agreement was stated in section 1 of the agreement. Section 1 provides,

The general purposes of the agreement are to establish the dealer of goods covered by this agreement, and to govern the relations between the dealer and the company in promoting the sale of those goods and their purchase and sale by the dealer, and in providing warranty and other service for their users.

J.App. 506 (quoting agreement). The court interpreted this language to mean that the primary purpose of the agreement was to establish the dealership and the terms of interaction and was not "mutual profitability" as asserted by IH. Therefore, the court reasoned that a dramatic down-turn in the farm equipment market resulting in reduced profitability did not frustrate the primary purpose of the agreement. *Id.* at

505–07. The court went on to suggest that continuity of market conditions or the financial situation of the parties were not basic assumptions or implied conditions to the enforcement of a contract. *Id.* at 507. Thus, following *Groseth*, it held that the doctrine of frustration was not applicable to this case. *Id.*

■■■ IH does not offer any arguments which challenge the correctness of the *Groseth* decision or the district court's analysis. Rather, IH challenges the court's finding that the primary purpose of the contract was not "mutual profitability." In our view, the district court had substantial grounds for so finding and we affirm the district court's grant of a directed verdict for Wendt on the frustration defense. If IH's argument were to be accepted, the "primary purpose" analysis under the Restatement would essentially be meaningless as "mutual profitability" would be implied as the primary purpose of every contract. Rather, like the doctrine of impracticability, the doctrine of frustration is an equitable doctrine which is meant to fairly apportion risks between the parties in light of unforeseen circumstances. It is essentially an implied term which is meant to apportion risk as the parties would have had the necessity occurred to them. *See Groseth*, 410 N.W.2d at 166; *Patch v. Solar Corp.*, 149 F.2d 558, 560 (7th Cir.1945), *cert. denied*, 326 U.S. 741, 66 S.Ct. 53, 90 L.Ed. 442 (1945). In this case, the frustrating event was IH's decision to sell its farm equipment assets and go out of that line of business. While IH might have determined that such a move was economically required, it may not then assert that its obligation under existing agreements are discharged in light of its decision.[2] For these reasons, we affirm.

## B. Section 2 of the Dealer Agreement.

■■ Section 2 of the Dealer Agreement provides, in relevant part:

> The agreement shall cover all those items of agricultural tractors, machines, equipment and attachments, which appear in the agricultural equipment price list issued by the company, and service parts for such goods. The company reserves the right to make additions to and eliminations from such list, including but not limited to reductions resulting from the discontinued production of a line or lines of such tractors, machines, equipment and attachments, without incurring any responsibility to the dealer.

J.App. at 545. IH asserts that this provision authorizes IH to completely withdraw from the market. The theory is that if IH may withdraw some of its product lines it may also withdraw all of them.

Authority is split as to whether IH's asserted interpretation is correct. In *J.I. Case Co. v. Berkshire Implement Co.*, No. S86–555, slip op. at 7–10 (N.D.Ind. March 3, 1987) (following *St. Joseph Equipment v. Massey–Ferguson, Inc.*, 546 F.Supp. 1245 (W.D.Wis.1982)), the court interpreted a provision very similar to section 2 of the Dealer Agreement as enabling the manufacturer to eliminate all its product lines and go out of business. In *Groseth*, 410 N.W.2d 159 (S.D.1987), however, the court read section 2 of the same Dealer Agreement to allow IH to eliminate or change certain products or product lines, but not to eliminate its farm products altogether.

In the instant case, the district court followed the *Groseth* view of section 2 of the Dealer Agreement and we find that interpretation to be the correct one. Section 2, by its terms, seems to be intended to allow IH to make shifts in its product lines and to discontinue product lines without changing the binding force of the agreement. We find it quite a stretch to believe that the parties intended this provision to

---

**2.** In addition to an examination of whether the "primary purpose" of the contract was frustrated, Section 265 of the Restatement also requires that the frustrating event occur without the "fault" of the party seeking discharge. It does not seem to us a stretch to conclude that since the frustrating event was IH's decision to sell its farm equipment assets without following the termination provisions of the contract, the frustration of the contract was IH's fault. IH would of course assert that it had no choice but to sell the assets, but we have covered this ground before. Thus, IH's fault in the frustration of its dealer agreements provides an additional reason for the inapplicability of the doctrine.

function as an alternative means for termination of the contract. This interpretation is reenforced by the fact that the agreement provides specific conditions and provisions for termination. *See* J.App. 555–61 (Section of the contract entitled "Termination of the Agreement"). As we find the court's interpretation of section 2 of the agreement correct as a matter of law, we affirm.

### C. An Implied Term that the Agreement was of Limited Duration.

■ Finally, IH asserts that the district court erred in refusing to find that an implied term of every dealership agreement is the ability of the manufacturer to go out of business. For this position, IH relies on dicta from the Supreme Court of Michigan in *Lichnovsky v. Ziebart Int'l. Corp.*, 414 Mich. 228, 324 N.W.2d 732 (1982). The court in *Lichnovsky*, held that while it might be appropriate to imply a term for termination of an agreement when no termination provisions existed in the contract, it would not imply such a term in a contract which provided for termination of the agreement for cause. *Id.* at 414 Mich. at 242–43, 324 N.W.2d at 739–40. In response to the argument that the Court's holding would create a perpetual franchise agreement, the Court stated:

There are relatively few enterprises that last even fifty or a hundred years, let alone forever. Just as an agreement for life employment (terminable for cause) is subject to the vicissitudes of human mortality, so too a franchise agreement is subject to the vicissitudes of the market[.]

\* \* \* \* \* \*

At some point, that which Ziebart and Lichnovsky agreed upon may no longer be viable. The life of the subject matter of their agreement will be at an end. 414 Mich. at 243–44, 324 N.W.2d at 740. Using this language, IH urges this court to imply a term which would allow termination of a franchise agreement when the manufacturer goes out of business. IH cites as precedent for this proposition *Delta Truck & Tractor v. J.I. Case, Co.*, No.

85–2606, 1990 WL 294415, slip op. at 2–3 (W.D.La.1990), which, relying on *Lichnovsky*, holds that in the absence of a specified duration of performance in the contract a reasonable time will be implied. The court held that a reasonable time in the circumstance of the IH franchise agreement was the period in which IH manufactured farm equipment. Hence, the court implied a term that when IH ceased to manufacture such equipment, the agreement was terminated. We find the court's invocation of *Lichnovsky* in *Delta Truck* misplaced as the Dealer Agreement, like the contract in *Lichnovsky* has provisions for its termination for cause. Following *Lichnovsky* would require that no term be implied when the contract itself provides the circumstances for its own termination in its termination provisions.

As noted above, courts will use their equitable power to imply terms into contracts in circumstances which would apportion the risk of loss as the parties would have had they thought to include such a provision. *See, e.g, Groseth*, 410 N.W.2d at 166; *Patch*, 149 F.2d at 560. In this case, the evidence supports the conclusion that while either party might have anticipated market shifts neither party anticipated that IH would go out of the farm equipment business completely. Implying a term which enables IH to terminate its franchise agreement unilaterally without following the termination conditions of the agreement and without incurring a breach places all the risk on the dealer. Rather, if economic circumstances require that IH leave the market for farm products, it should properly seek to terminate its agreement under the terms of the agreement. This is precisely the same conclusion the *Lichnovsky* court arrived at in determining that a franchise agreement was not terminable at will, but rather terminable only for cause by its terms. *See Lichnovsky*, 414 Mich. at 242–43, 324 N.W.2d at 739–40. As there is no evidence which suggests that IH sought to terminate its agreement with Wendt by mutual agreement under the terms of the agreement, the district court properly granted a directed verdict for Wendt on this defense.

## IV.

As its final assignment of error, Wendt asserts that the district court failed to apply the repurchase provisions of the Michigan Farm and Utility Equipment Franchise Act, Mich.Comp.Laws Ann. section 445.1451, *et seq.* in calculating its deficiency judgment on IH's counter-claims. Section 445.1453 lays out the scope of the act:

> If a dealer enters into a franchise agreement with a supplier that is evidenced by a written or implied contract, sales agreement, or security agreement, in which the dealer agrees to maintain an inventory and the contract, sales agreement, or security agreement is subsequently terminated, the supplier shall repurchase the inventory of the dealer as provided in this act. The dealer may choose to keep the inventory if the dealer has a contractual right to do so.

Section 445.1454 explains the terms under which the supplier is required to repurchase the dealer's equipment, and subsection 3 of this section provides that the dealer may use the proceeds from the repurchase to offset debts owed by the dealer. Wendt asserts that the trial court erred in failing to take account of these provisions in calculating damages on IH's counter-claims.

■ We find that Wendt failed to raise the provisions of the Farm Act before the district court at an appropriate point in the proceedings. After the court initially ordered Wendt to return the goods to IH in recognition of IH's replevin action, Wendt refused asserting that the court had to apply the provisions of the Farm Act. Later, IH filed a motion for contempt of the court's order of replevin. In its responding order, the court noted that the Farm Act was not relevant as to whether Wendt had to tender the goods to IH in replevin, but was relevant as to the calculation of damages or a deficiency judgment. However, while the court recognized that the Farm Act might be relevant in the calculation of any deficiency, Wendt never raised the provisions of the Farm Act in its answer to IH's motion for a deficiency judgment. Rather, Wendt simply asserted that the proper amount of the deficiency was $180,379.21. *See* J.App. at 207. This amount was later agreed to by IH and entered as a stipulated amount in the court's deficiency judgment.

Since Wendt failed to raise the provisions of the Farm Act at the time in the proceedings pertaining to the calculation of damages in the deficiency judgment, it should not now be permitted to raise them on appeal. *See Acwoo International Steel Corp. v. Toko Kaiun Kaish, Ltd.,* 840 F.2d 1284, 1288 n. 3 (6th Cir.1988) (refusing to hear on appeal an issue which was not raised before the district court). Further, our holding should impose no hardship upon Wendt because the amount ordered in the deficiency was the amount Wendt asserted to be the correct amount. J.App. at 207. We therefore affirm the district court's calculation of damages on IH's counterclaims in its deficiency judgment.

## V.

As the district court erred in allowing the defense of impracticability of performance to go to the jury in this case under Michigan law, we REVERSE and REMAND for a new trial only on the question of damages for IH's breach of its Dealer Agreement with Wendt. With respect to all other assignments of error by the parties, we AFFIRM.

RYAN, Circuit Judge (dissenting).

The court has held that the district court erred in submitting the defendants' defense of impracticability of performance to the jury. I disagree.

The court concedes, correctly I think, that the Michigan Supreme Court "might" recognize the impracticability doctrine, but the court says, "it would not do so in the circumstances of this case as a matter of law." Despite the court's use of the verb "might," I assume it means the Michigan Supreme Court, in all probability, "would," if asked, adopt the doctrine of impracticability of performance as defined in Restatement (Second) of Contracts § 261. The strongest indication of that, since the Michigan Supreme Court has not spoken on

the matter, is the Michigan Court of Appeals decision in *Bissell v. L.W. Edison Co.*, 9 Mich.App. 276, 156 N.W.2d 623 (1967), in which the impracticability defense is recognized. In declaring that the Michigan Supreme Court would not apply the doctrine "in the circumstances of this case," I take the court to mean the "facts" of this case. The court cannot mean that the impracticability doctrine can never be applied in a case involving unforeseeable, extreme, and unreasonable economic circumstances. There is simply no authority to be found in the Michigan cases, or indeed in the commentary to section 261 of the Restatement (Second) of Contracts, to suggest that no change in economic circumstances, no matter how catastrophic, would ever be sufficient to invoke the impracticability defense. Indeed, the majority opinion observes that the commentary to section 261 "provides extensive guidance for determining *when* economic circumstances are sufficient to render performance impracticable." (Emphasis added.)

It appears that the majority opinion rejects the impracticability defense "in the circumstances of this case" because, in the court's view, the economic reverses confronted by International Harvester were not so "extreme and unreasonable," severe, or catastrophic as to excuse performance of the franchise agreement with the plaintiffs. Although claiming to recognize that whether impracticability of performance has been proved is a question of fact for the jury, *Michigan Bean Co. v. Senn*, 93 Mich.App. 440, 287 N.W.2d 257 (1979), the court appears to disagree with the jury that International Harvester was confronted with economic circumstances sufficiently disastrous to justify discharge for impracticability. There were "alternatives," the court says, "which might have precluded unilateral termination of the contract." One such alternative open to International Harvester, the court suggests, might have been "to terminate [the] Dealer Agreements by mutual assent under the termination provisions of the contract and share the proceeds of the sale of assets to Case/Tenneco with its dealers."

Whether the "alternative" the court suggests ever occurred to International Harvester's management, or, if considered, was a feasible business solution, is entirely irrelevant on this appeal because it is the jury, not this court, that is empowered to determine whether International Harvester proved impracticability of performance as that defense was defined by the trial court.

The district court correctly recognized that the standard for determining whether there was a jury submissible issue of impracticability is set forth in Restatement (Second) of Contracts § 261 (1981):

§ 261. Discharge by Supervening Impracticability

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

The "event" International Harvester relies upon is a sudden, massive, near total collapse of the farm equipment industry that was nationwide, drove two major suppliers into bankruptcy, and resulted in losses to International Harvester of over $2 billion in four years.

There is no quarreling with the defendants' version of the facts for purposes of reviewing the plaintiff's motion for judgment notwithstanding the verdict. In reviewing the district court's refusal to grant International Harvester's motion for judgment notwithstanding the verdict, we are obligated to apply the Michigan standard. In Michigan,

a judgment notwithstanding the verdict on a defendant's motion is appropriate only if the evidence is insufficient as a matter of law to support a judgment for the plaintiff. In reaching a decision, the trial court must view the evidence in the light most favorable to the plaintiff and give the plaintiff the benefit of every reasonable inference that could be drawn from the evidence. If, after viewing the evidence in this manner, reasonable peo-

**1124**

ple could differ, the question is one for the jury and judgment notwithstanding the verdict is proper. *Jacobs v. St. Clair County,* 163 Mich.App. 230, 234, 414 N.W.2d 161 (1987).

When all facts and reasonable inferences therefrom are taken in a light most favorable to International Harvester, they reveal a sudden, unforeseen, nationwide collapse of the farm implement industry so severe and so widespread that International Harvester, after losing over $2 billion in four years, was faced, in its business judgment, with no alternative but bankruptcy or selling off its farm implement division. *Those* are the facts as we must view them for purposes of this appeal. The question for us, then, is whether "reasonable people could differ" that those facts amounted to "an event, the non-occurrence of which was a basic assumption on which the contract was made." Restatement (Second) of Contracts, *supra.* Manifestly, they could. The majority opinion is an indication of that.

Since there is nothing in the jurisprudence of the impracticability defense to suggest that a market collapse of the kind shown by International Harvester is not, as a matter of law, within the doctrine, we are not free to disturb the jury's verdict.