RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

HEMLOCK SEMICONDUCTOR OPERATIONS, LLC,

　　　　　　　　　　　　*Plaintiff-Appellee,*

　　v.

SOLARWORLD INDUSTRIES SACHSEN GMBH,

　　　　　　　　　　　　*Defendant-Appellant.*

┐
│
│
│  No. 16-2181
│
│
┘

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:13-cv-11037—Thomas L. Ludington, District Judge.

Argued:  June 14, 2017

Decided and Filed:  August 16, 2017

Before:  MOORE, GILMAN, and COOK, Circuit Judges.

---

### COUNSEL

**ARGUED:**  Larry K. Elliott, COHEN & GRIGSBY, P.C., Pittsburgh, Pennsylvania, for Appellant.  John Ansbro, ORRICK, HERRINGTON & SUTCLIFFE LLP, New York, New York, for Appellee.  **ON BRIEF:**  Larry K. Elliott, Richard A. Ejzak, David F. Russey, Christina Manfredi McKinley, COHEN & GRIGSBY, P.C., Pittsburgh, Pennsylvania, Daniel P. Malone, Joseph E. Richotte, BUTZEL LONG, P.C., Bloomfield Hills, Michigan, for Appellant.  John Ansbro, J. Peter Coll, Jr., Daniel W. Robertson, Alvin Lee, ORRICK, HERRINGTON & SUTCLIFFE LLP, New York, New York, Craig W. Horn, Jamie Hecht Nisidis, BRAUN KENDRICK FINKBEINER PLC, Saginaw, Michigan, for Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge.   Hemlock Semiconductor Operations, LLC (Hemlock) and SolarWorld Industries Sachsen GmbH (Sachsen) are both involved in manufacturing components of solar-power products.   They entered into a series of long-term supply agreements (LTAs), by which Hemlock in Michigan would supply Sachsen in Germany with set quantities of polycrystalline silicon (polysilicon) at fixed prices between the years 2006 and 2019.   The market price of polysilicon was initially well above the LTA price, but the market price plummeted several years later after the Chinese government began subsidizing its national production of polysilicon.   The parties reached a temporary agreement to lower the LTA price in 2011.   When that agreement expired in 2012, however, the price reverted to the original amount.   Hemlock then demanded that Sachsen pay the original LTA price for the specified quantity of polysilicon for the year 2012.   Sachsen refused.

This caused Hemlock to sue Sachsen for breach of contract in the United States District Court for the Eastern District of Michigan.   Based on Hemlock's motion for summary judgment, which the district court granted, Hemlock was awarded nearly $800 million in damages and prejudgment interest.   For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.     Factual background

Hemlock and Sachsen negotiated a series of four LTAs.   The first LTA (LTA I) was executed in 2005 and was to remain in force through 2015.   Subsequent LTAs (LTAs II–IV) extended the parties' relationship to the end of 2019.   The first three LTAs are nearly identical. LTA IV is structured differently than the others, but the text of the provisions at issue is essentially the same as in LTAs I–III.

Two provisions of the LTAs are particularly relevant to the present case.  First, a "take-or-pay" provision required that Sachsen purchase a specified quantity of polysilicon each year at a fixed price.  The take-or-pay provision obligated Sachsen to pay this yearly amount even if it declined to take delivery of the polysilicon.  Second, in the event that Sachsen failed to pay the specified amount for a given year, Hemlock had the right to terminate the LTAs.  Sachsen would then owe Hemlock the full remaining balance of the LTA price, including amounts due for future years.  We will refer to this second provision as "the liquidated-damages provision."

After entering into the LTAs, Hemlock began a massive expansion of its manufacturing facilities in the United States at a cost of over $4 billion.  The LTAs acknowledged the planned expansion several times.  Sachsen was required to make significant advance payments to Hemlock under the LTAs, which were then credited against the purchase price of the polysilicon.  Although the LTAs do not explicitly describe the reason for the advance payments, Sachsen acknowledges that the purpose of the payments was to help fund Hemlock's expansion.

For the first few years of the LTAs' existence, Sachsen obtained polysilicon from Hemlock at a price far below the then-current market value.  This began to change in 2009, however, when the Chinese government started subsidizing its national production of polysilicon.  The result was that the market price of polysilicon eventually dropped below the LTA price.

In response, Hemlock and Sachsen negotiated a temporary adjustment to the LTA price in 2011.  After that agreement expired the following year, the parties attempted to negotiate further amendments but were unable to reach an agreement.  The district court's order granting summary judgment describes the negotiations in detail, which we find no need to repeat.

In March 2013, Hemlock sent Sachsen a "Shortfall Notice" that set forth the quantities of polysilicon that Sachsen had failed to purchase under the LTAs in 2012 and that demanded payment pursuant to the take-or-pay provision.  Sachsen responded by insisting that it "did not fall short of any purchase obligations," that the parties had permanently amended the LTAs, and that Hemlock had waived the ability to enforce the LTAs.  Two days later, Hemlock sued, seeking the full amount due under the liquidated-damages provision.

**B.      Procedural background**

Hemlock filed its complaint in the district court against Sachsen in March 2013.  In its answer, Sachsen asserted 17 affirmative defenses, including illegality, commercial impracticability, and frustration of purpose.  Hemlock moved to strike several of the affirmative defenses under Rule 12(f) of the Federal Rules of Civil Procedure.  The court granted the motion in part, striking Sachsen's argument that the LTAs were illegal under European Union (E.U.) and German antitrust laws.  Sachsen filed a motion for reconsideration of that decision, arguing that the court erroneously ignored one of Sachsen's arguments and misinterpreted the burden of proof under the E.U. antitrust laws at issue.  The court denied the motion, concluding that despite these alleged errors, Sachsen's illegality defenses still lacked merit.

Hemlock subsequently filed a motion for summary judgment in its favor on its breach-of-contract claim.  The district court granted the motion, concluding that all of Sachsen's remaining affirmative defenses were unavailing and that Hemlock was entitled to recover under the liquidated-damages provision.  Judgment for the full amount of damages requested by Hemlock, as well as for prejudgment and post-judgment interest, was entered against Sachsen.  In a separate order, the district court granted in part Hemlock's motion for attorney fees and costs.

Before us on this appeal are the district court's decisions to strike the illegality defense, to deny reconsideration of the decision to strike that defense, and to grant summary judgment to Hemlock.  Sachsen has filed a separate appeal challenging the attorney-fee award.

## II. ANALYSIS

**A.      Standard of review**

Sachsen first argues that the district court improperly granted Hemlock's motion to strike Sachsen's affirmative defense of illegality, and that the district court subsequently erred in denying Sachsen's motion for reconsideration of that decision. Although "[m]otions to strike are viewed with disfavor," such motions are properly granted when "plaintiffs would succeed despite any state of the facts which could be proved in support of the defense." *Operating*

*Eng'rs Local 324 Health Care Plan*, 783 F.3d 1045, 1050 (6th Cir. 2015) (quoting *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1400 (7th Cir. 1991)).

We apply the abuse-of-discretion standard to review the district court's decision to strike an affirmative defense under Rule 12(f) of the Federal Rules of Civil Procedure. *See id.* A district court abuses its discretion, among other reasons, if it commits legal error. *United States v. Holden*, 557 F.3d 698, 703 (6th Cir. 2009).

Sachsen next challenges the district court's grant of summary judgment to Hemlock. We review de novo the district court's grant of summary judgment. *Williams v. AT&T Mobility Servs.*, 847 F.3d 384, 391 (6th Cir. 2017). Summary judgment is proper when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We "must view all evidence in the light most favorable to the nonmoving party in making this determination." *Williams*, 847 F.3d at 391.

**B.      The district court did not abuse its discretion in striking Sachsen's illegality defense or in denying Sachsen's motion to reconsider that decision.**

Sachsen argues that the district court improperly struck its defense that the LTAs were illegal under E.U. and German antitrust law. According to Sachsen, the LTAs were illegal for two reasons. It first argues that the take-or-pay provision and a separate prohibition on resale are inextricably linked, and that the combination of the two is facially illegal under E.U. and German antitrust law. Second, Sachsen argues that the LTAs violated E.U. antitrust law by tying Sachsen's predominant demand for polysilicon to a single seller—Hemlock.

### 1. *The district court properly struck Sachsen's antitrust defense because enforcing the take-or-pay provision does not require the parties to engage in the precise conduct that is allegedly unlawful.*

In support of its argument that the combination of the take-or-pay and resale-prohibition provisions is illegal, Sachsen cites two decisions of the German Federal Cartel Bureau (the BKartA), as well as an E.U. Commission Regulation and the European Commission Guidelines on Vertical Restraints. The BKartA decisions opine that vertical agreements containing both

take-or-pay and resale-prohibition provisions might violate E.U. and German antitrust law.  And the E.U. Regulation states that vertical supply agreements with this combination of provisions violate E.U. antitrust law.  E.U. Comm'n Reg. No. 330/2010, art. 4(b).

Hemlock responds by raising four independent grounds in support of the district court's decision to strike Sachsen's illegality defense.  The primary ground raised by Hemlock is that enforcing the take-or-pay provision at issue in the present case does not engender any illegal conduct and that, under Supreme Court precedent, the district court properly struck Sachsen's illegality defense.  Because Hemlock's primary argument is persuasive, we have no need to reach Hemlock's three alternative arguments.

Two Supreme Court cases govern the inquiry of when courts should refuse to enforce contracts that violate antitrust law.  The first case is *Kelly v. Kosuga*, 358 U.S. 516 (1959).  In *Kelly*, the plaintiff possessed a large quantity of onions in storage, and the defendant was an onion grower.  The plaintiff threatened to flood the futures market with surplus onions, which would cause the price of onions to fall, unless the defendant agreed to purchase large quantities of onions from the plaintiff.  So the defendant agreed to purchase the onions, and both parties promised not to sell any of the onions at issue on the futures market.  The alleged purpose of the contract was "to fix the price of onions and limit the amount of onions sold."  *Id.* at 517.  After the defendant failed to pay for all of the onions that it purchased, the plaintiff sued for breach of contract.  The defendant asserted that the contract should not be enforced because it violated the Sherman Act.  *Id.* at 516.

In rejecting the illegality defense, the Supreme Court stated that "the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court.  This has been notably the case where the plea has been made by a purchaser in an action to recover from him the agreed price of goods sold."  *Id.* at 518.  The Court went on to explain that courts should be reluctant to "create a policy of nonenforcement of contracts beyond that which is clearly the requirement of the Sherman Act."  *Id.* at 519.  In other words, the court should decline to enforce a contract that violates the antitrust laws only if "the judgment of the Court would itself be enforcing the *precise conduct made unlawful* by the Act."  *Id.* at 520 (emphasis added).

If buyers were allowed to broadly assert antitrust defenses, they would be able to unfairly obtain goods without paying for them. *Id.*

The Supreme Court noted that it would not have enforced the allegedly illegal aspect of the contract in *Kelly*—i.e., the parties' agreement not to resell the onions at issue on the futures market. *Id.* at 521. But the Court concluded that the portion of the agreement governing the initial sale of onions between the parties was lawful and should be enforced. *Id.* Such agreements are enforceable even if they contain an illegal provision that is not at issue in the action "where, as here, a lawful sale for fair consideration constitutes an intelligible economic transaction in itself." *Id.*

In the second Supreme Court case on point, *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982), the Court held that the defendant was entitled to assert an illegality defense to a contract that allegedly violated antitrust law. The defendant, a coal producer, was a party to a collective-bargaining agreement with a coal miners' union. That agreement contained a "purchased-coal provision," requiring the producer to report purchases of coal from nonunion sources and to contribute for each such purchase a specified amount of money to the union's health-and-retirement fund. After the defendant failed to report nonunion purchases and to make the requisite contributions, the trustees of the union's fund sued for breach of contract. The defendant argued that the purchased-coal provision was an illegal "hot-cargo provision" that violated the Sherman Act and the National Labor Relations Act. *Id.* at 78.

In *Kaiser*, the alleged illegality was that the purchased-coal provision promoted anticompetitive conduct because the requirement to contribute to the union's fund made purchases from nonunion producers more expensive than purchases from union producers. *Id.* at 79. That provision was the exact subject of the defendant's challenge to the contract. The Supreme Court held that the defendant could assert the illegality defense because enforcing the purchased-coal provision "would command conduct that assertedly renders the promise an illegal undertaking." *Id.* In explaining its holding, the Court noted that *Kelly* was consistent with its decision in *Kaiser*. *Id.* at 79–82. *Kelly* enforced a promise that was legal, even though the promise was part of an agreement containing a separate, illegal provision. *Id.* *Kaiser*, on the other hand, declined to enforce a promise that was deemed illegal in and of itself. *Id.*

Both parties agree that *Kelly* and *Kaiser* govern the applicability of the illegality defense in the present case. But they disagree as to which case is the more analogous. We agree with Hemlock and the district court that the present case is closer to *Kelly* than to *Kaiser*. Here, as with the sale of onions between the parties in *Kelly*, there is nothing illegal about the payments pursuant to the take-or-pay provision. Furthermore, this case involves a seller, Hemlock, suing a purchaser, Sachsen, who failed to make contractually mandated payments. So the policy interest in preventing Sachsen from obtaining the benefit of its bargain without paying applies. *See Kelly*, 358 U.S. at 520.

The alleged illegality here is the fact that the LTAs contain both a take-or-pay provision and a prohibition on resale. Hemlock is suing to enforce only the take-or-pay provision—in other words, to require Sachsen to make the promised payments for polysilicon. The prohibition on resale is not at issue. And there is no indication in this case that Sachsen will be left with a glut of polysilicon that the LTAs prohibit it from reselling. In fact, Sachsen chose not to receive any further shipments of polysilicon. This nondelivery provided Sachsen with the basis to argue that Hemlock will save money from not incurring the costs of producing the polysilicon that Hemlock would have produced in future years under the LTAs.

Sachsen nevertheless asserts that the take-or-pay and resale-prohibition provisions are inextricably intertwined. First, Sachsen argues that the combination of the two provisions is "inherently illegal and void" under E.U. and German law, and that enforcing the take-or-pay provision would "condone the very harm the E.U. antitrust laws seek to prevent." But the take-or-pay provision in isolation is legal, and Sachsen does not argue otherwise.

Indeed, in one of the decisions that Sachsen cites, the BKartA settled the case after obtaining an agreement from the party charged to simply remove the resale-prohibition provision from the contract. The take-or-pay provision remained unaltered by the settlement. This suggests that enforcing only the take-or-pay provision is consistent with E.U. and German antitrust law. Furthermore, *Kelly* and *Kaiser* hold that we must review for illegality only the "particular conduct" that the plaintiff seeks to enforce. Whether such conduct would be illegal if combined with other actions contemplated by the contract, but not at issue in the present case, is beyond the inquiry mandated by *Kelly* and *Kaiser*.

Sachsen next argues that the definition of the term "Product" in the LTAs incorporates the resale-prohibition provision, and that by using the term "Product," the take-or-pay provision links itself to the resale-prohibition provision. This argument has no merit. True enough, the resale-prohibition provision is contained within paragraph 1 of LTAs I–III and paragraph 2 of LTA IV, both of which also state that "'Product' or 'Products' shall mean the polycrystalline silicon manufactured by [Hemlock]." But these paragraphs contain more than the definition of "Product." They specify various terms and conditions applicable to the parties' LTAs, one of which happens to be the resale-prohibition provision. Although the take-or-pay provision requires Sachsen to pay for "Product" that it fails to take, this does not mean that the resale-prohibition provision is integral to the operation of the take-or-pay provision.

In sum, we find no inextricable link between the two provisions in question. We therefore conclude that the district court did not err in striking the illegality defense under *Kelly* and *Kaiser*.

> **2.  The district court did not err in striking Sachsen's defense that the LTAs illegally tied Sachsen's predominant demand for polysilicon to a single seller, Hemlock, in violation of E.U. antitrust law.**

Sachsen argues in the alternative that the LTAs violated an E.U. regulation prohibiting contracts with terms of at least five years from imposing "any direct or indirect obligation on" a buyer to purchase more than 80% of its requirements for a product from a single seller. E.U. Comm'n Reg. No. 330/2010, art. 1(d). Such contracts are legal only if the seller can demonstrate that its market share for the product is less than 15%. European Commission Guidelines on Vertical Restraints, 2010/C/130, ¶ 96.

The district court struck this illegality defense on the ground that determining Hemlock's market share of polysilicon would require "complex proof of monopoly power." In *Nat'l Souvenir Ctr., Inc. v. Historic Figures, Inc.*, 728 F.2d 503 (D.C. Cir. 1984), the D.C. Circuit interpreted *Kelly* and *Kaiser* to require it to reject an antitrust defense claiming that a franchise contract between a wax museum and a supplier of wax figures created an illegal tie-in between the wax figures and the franchisor's start-up services for franchisee museums. *Id.* at 515. Because the contract was legal on its face, proving that it contained an illegal tie-in in practice would have required proof external to the agreement of circumstances including the defendant's

market power.  The defense's "complexity of proof and speculative nature . . . [would] place [it] outside of the [*Kaiser*] exception and clearly within the ambit of disfavor for such defenses articulated in [*Kelly*]."  *Id.* at 516.  Allowing the defense would "involve the courts in a prolonged controversy" over antitrust market conditions in what would otherwise be a simple breach-of-contract suit.  *Id.*  Furthermore, the D.C. Circuit echoed the policy considerations from *Kelly* and *Kaiser* that illegality defenses based on antitrust law are disfavored, especially when allowing the defense would "let the buyer escape from its side of a bargain" after having received a benefit.  *Id.*

Like the contract at issue in *National Souvenir*, the LTAs do not facially violate E.U. antitrust law.  Hemlock correctly points out that the LTAs do not require Sachsen to fulfill any particular percentage of its demand for polysilicon by purchasing from Hemlock.  Sachsen does not dispute this statement, and our review of the contract has not revealed any provision linked to a certain amount of Sachsen's demand.  Whether Sachsen was indirectly obligated to purchase at least 80% of its polysilicon need from Hemlock would therefore depend on how much polysilicon Sachsen decided to purchase in a given year.  This would be speculative in nature because we cannot know how much polysilicon Sachsen would have decided to purchase had it followed the LTAs.  Sachsen insists in its reply brief that proving demand is "a simple task," but that does not change the fact that Sachsen could buy less than 80% of its polysilicon from Hemlock so long as it purchased the amount of polysilicon specified in the contract. Furthermore, proof of Sachsen's demand would require the district court to evaluate additional evidence unrelated to the breach-of-contract claim at issue here.

Even if Sachsen purchased more than 80% of its polysilicon from Hemlock, Sachsen's illegality defense would also require proof as to whether Hemlock possessed more than a 15% share of the market for polysilicon.  Sachsen does not dispute that proving the percentage of Hemlock's market share is a complex question, and we note that answering this question might also involve speculation because Hemlock's market share could depend on Sachsen's purchase decisions.  Rather, Sachsen argues that because the burden would be entirely on Hemlock to demonstrate its market share, the district court improperly struck Sachsen's illegality defense.

The district court, however, concluded that even if Hemlock bore the entire burden of demonstrating its market share, Sachsen's defense would nevertheless be foreclosed by *Kelly*, *Kaiser*, and *National Souvenir*. We agree. Allowing Sachsen's illegality defense would open the door to a dispute about the extent of Hemlock's market power, which would involve facts that are "entirely unrelated to" the underlying breach-of-contract claim at issue here. *See Nat'l Souvenir*, 728 F.2d at 516. *National Souvenir* correctly determined that *Kelly* and *Kaiser Steel* stand for the proposition that the courts should be reluctant to allow litigation over speculative, complex antitrust issues to infiltrate simple breach-of-contract claims when the contract on its face does not violate antitrust law. Nothing in these cases suggests that the propriety of litigating antitrust issues depends on which party bears the burden of proof. We therefore find no error in the district court's decision to strike Sachsen's illegality defense.

**C.     The district court did not err in concluding that Sachsen's affirmative defenses of commercial impracticability and frustration of purpose lack merit.**

Sachsen next argues that the district court erred in concluding that the doctrines of commercial impracticability and frustration of purpose do not excuse Sachsen's breach of contract. The theory underlying both defenses is that the Chinese government (1) illegally subsidized its national production of polysilicon and dumped massive quantities of the product onto the market, causing the price of polysilicon to fall; and (2) committed acts of "criminal industrial espionage" against Sachsen's U.S.-based sister company, SWIA. As a result of these illegal actions, Sachsen argues, the price of polysilicon plummeted, rendering Sachsen's performance impracticable and frustrating the purpose of entering into the LTAs.

We will assume without deciding that the alleged illegal actions by the Chinese government actually occurred. Hemlock does not in fact dispute Sachsen's evidence that these actions were deemed illegal by both U.S. and E.U. authorities. Rather, Hemlock argues that the district court properly rejected Sachsen's affirmative defenses because the drop in the price of polysilicon, regardless of cause, was simply a change in market conditions that does not excuse contract performance.

***1. Sachsen's commercial impracticability defense lacks merit.***

Sachsen asserts the affirmative defenses of commercial impracticability and impossibility. Both parties and the district court discuss these defenses interchangeably. We will therefore refer to these defenses collectively as "commercial impracticability."

Under Michigan law, a party charged with breaching a contract can assert as an affirmative defense that its performance was rendered impracticable. *Capital One Bank USA N.A. v. Ponte*, No. 307664, 2013 WL 6692511, at *10 (Mich. Ct. App. Dec. 19, 2013). Performance need not be impossible, but "there must be a showing of impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved." *Roberts v. Farmers Ins. Exch.*, 737 N.W.2d 332, 342 (Mich. Ct. App. 2007) (quoting *Bissell v. L.W. Edison Co.*, 156 N.W.2d 623, 627 (Mich. Ct. App. 1967)). The impracticability defense applies only if "an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract." *Capital One Bank*, 2013 WL 6692511, at *10 (quoting *Bissell*, 156 N.W.2d at 627). In other words, the defense is viable only if an unforeseen event occurs and "the non-occurrence of that event [was] . . . a basic assumption on which both parties made the contract." *Karl Wendt Farm Equip. Co. v. Int'l Harvester Co.*, 931 F.2d 1112, 1117 (6th Cir. 1991) (citing Restatement 2d of Contracts § 261 cmt. b) (applying Michigan law).

The expectation that current market conditions will continue for the life of the contract is not such a basic assumption, so shifts in market prices ordinarily do not constitute impracticability. *Id.* Likewise, the simple fact that a contract has become unprofitable for one of the parties is generally insufficient to establish impracticability. *Id.* (citing Restatement 2d of Contracts § 261 cmt. d). This is especially true when the parties have entered into a contract for the sale of goods at fixed prices because such contracts are made for the very purpose of establishing a stable price despite a fluctuating market. *Chainworks, Inc. v. Webco Indus., Inc.*, 2006 WL 461251, at *10 (W.D. Mich. Feb. 24, 2006) (citing Mich. Comp. Laws § 440.2615 cmt. 4 ("Neither is a rise or a collapse in the market itself a justification [for asserting the impracticability defense], for that is exactly the type of business risk which business contracts made at fixed prices are intended to cover.")).

Even relatively drastic changes in the market have been held insufficient to trigger the impracticability defense. In *Karl Wendt Farm Equipment Co. v. International Harvester Co.*, 931 F.2d 1112, 1117 (6th Cir. 1991), for example, this court concluded that the Michigan Supreme Court would not apply the impracticability defense when International Harvester (IH) "experienced a dramatic downturn in the farm equipment market," decided to go out of business, and breached a dealership agreement by unilaterally terminating it. *Id.* The court rejected IH's argument that impracticability excused its contractual duties under circumstances where IH was losing over two million dollars per day. *Id.* Although the market shift was drastic, it did not alter the parties' basic assumptions underlying the contract. *Id.* at 1117–18. The court also noted that applying the doctrine of impracticability would contravene the parties' intentions regarding assumption of the risk. *Id.* at 1118. Because the contract provided for termination procedures in the event that certain conditions occurred, the court concluded that IH had to bear the risk of financial loss until those procedures were completed; excusing IH's performance would therefore have unfairly burdened the plaintiff dealer. *See id.* at 1114, 1118.

Similarly, a district court applying Michigan law concluded that a defendant could not assert an impracticability defense based on the economic downturn of 2008. *See Flathead-Michigan I, LLC v. Penninsula Dev., LLC*, No. 09-14043, 2011 WL 940048, at *3–4 (E.D. Mich. Mar. 16, 2011). The fact that the 2008 market collapse and the ensuing recession were unusually disastrous economic shifts did not excuse the defendant's performance, the court reasoned, because "[t]he state of the market is one of the things on which the parties are gambling when the contract . . . is made." *Id.* at *4 (quoting *Seaboard Lumber Co. v. United States*, 41 Fed. Cl. 401, 417 (Fed. Cl. 1998)).

Sachsen, however, argues that the impracticability defense should apply because the illegal actions of the Chinese government caused an out-of-the-ordinary drop in the market price for polysilicon. According to Sachsen, the fact that a third party's illegal actions allegedly caused this market shift differentiates the present case from *Karl Wendt* and other cases finding that changes in market conditions are not a basis for the impracticability defense.

The district court disagreed, reasoning that the allegedly illegal actions of the Chinese government were irrelevant because they had "simply caused a market shift in pricing, making it

unprofitable for [Sachsen] to perform as promised." In so ruling, the court incorporated its reasoning from the court's decision in Hemlock's case against another company, Kyocera, under a nearly identical LTA. *See Hemlock Semiconductor Corp. v. Kyocera Corp.*, 2016 WL 67596, at \*4 (E.D. Mich. Jan. 6, 2016). Because Sachsen's argument "amount[ed] only to claims of 'economic unprofitableness,'" the court concluded that the impracticability defense did not apply for the reasons stated in *Karl Wendt*. *See id.* at \*4.

We find the district court's reasoning persuasive. Our research has not revealed any caselaw from either this court or the Michigan courts supporting the proposition that a third party's illegal actions can render the performance of a contract impracticable. Hemlock and Sachsen presumably would not have specifically foreseen the allegedly illegal actions of the Chinese government when the parties entered into the LTAs. But the possibility that the market price for polysilicon could skyrocket or plummet for a myriad of reasons would have been well within their contemplation. The fact that the LTAs provided a fixed price for polysilicon suggests that the parties anticipated that the market price could change and that they wanted to establish a stable price that would operate independently of the market. *See Chainworks*, 2006 WL 461251, at \*10. Allowing Sachsen to escape its obligation to pay that price simply because the purported illegal actions contributed to the price drop would be unfair to Hemlock.

Applying the impracticability defense here could also open up a flood of similar arguments based on allegedly illegal actions of third parties. In the context of global market fluctuations, which can be affected by the actions of many businesses from different countries, defendants in breach-of-contract cases could easily claim that a violation of the law by a third-party actor contributed to a market shift. Allowing parties to litigate the causes of market shifts would swallow the general rule that a contract's unprofitability does not warrant application of the impracticality defense.

We also note that Sachsen could have protected itself against a large drop in the market price of polysilicon during the 14-year term of the LTAs by requiring a renegotiation if the market price dropped a certain percentage or dollar amount below the contract price. But no such condition was included in the LTAs despite the sophistication of both the parties and their

lawyers. Sachsen thus knowingly assumed the unfiltered risk of a drop in price for a high-tech product during a long-term, fixed-price contract.

### 2. *Sachsen's frustration-of-purpose defense also lacks merit.*

Sachsen makes the related argument that the Chinese government's illegal actions frustrated Sachsen's purpose in entering into the LTAs. Frustration of purpose and impracticability are "overlapping defenses." *Flathead-Michigan I*, 2011 WL 940048, at *4. Both defenses require proof that an unforeseen event altered "a basic assumption on which the contract was made." *Liggett Rest. Grp., Inc. v. City of Pontiac*, 676 N.W.2d 633, 637 (Mich. Ct. App. 2003) (quoting Restatement 2d of Contracts § 265, cmt. a). The frustration-of-purpose defense also requires that the unforeseen event thwart the parties' purpose in making the contract to such a degree that "one party's performance [becomes] virtually worthless to the other." *Id.* Like the impracticability defense, the frustration-of-purpose defense generally cannot be based on an argument that the continuation of existing market conditions was a "basic assumption" on which the contract was made. *Karl Wendt Farm Equip. Co. v. Int'l Harvester Co.*, 931 F.2d 1112, 1119–20 (6th Cir. 1991). And courts usually will not assume that "mutual profitability" was the primary purpose of a contract. *Id.*

The frustration-of-purpose defense is inapplicable to the present case for the same reasons that the impracticability defense is inapplicable. Sachsen points to no evidence that the "primary purpose" of the LTAs was anything other than what the district court found it to be— "for Hemlock to provide [Sachsen] with a stable supply of polysilicon at a predictable price." The court incorporated its reasoning from the court's earlier decision in *Kyocera*. *See* 2016 WL 67596, at *5. Sachsen's frustration-of-purpose argument essentially amounts to a claim that "mutual profitability" was the purpose of the LTAs. But this argument is unconvincing in light of the fact that the LTAs establish a fixed price under which either party could suffer depending on the relationship of the market price to the LTA price.

### 3. Sachsen's attempts to distinguish **Kyocera** *and to rely on an out-of-state case are unavailing.*

Sachsen next argues that the present case is distinguishable from the decision in *Kyocera*, which the district court incorporated into its decision granting summary judgment to Hemlock. This case is different, Sachsen insists, because (1) *Kyocera* was decided at the motion-to-dismiss stage, not at the summary-judgment stage, so there was less evidence in the record; and (2) the Chinese government's industrial espionage specifically targeted Sachsen's sister company, whereas the only illegal actions affecting the *Kyocera* defendant were the subsidization and dumping of polysilicon. The difference in procedural stages, however, is unhelpful to Sachsen because its defenses fail as a matter of law for the same reasons that the court in *Kyocera* dismissed the defendant's counterclaims. And Sachsen has pointed to no evidence that the industrial espionage aimed at its sister company caused it to suffer anything more than the same drop in market prices that was at issue in *Kyocera*.

Sachsen also relies on *Chang v. Pacificorp*, 157 P.3d 243 (Or. App. 2007), an Oregon Court of Appeals decision concluding that the defendant had established a genuine issue of material fact on its impracticability and frustration-of-purpose defenses. In *Chang*, the defendant asserted these defenses based on a third party's illegal manipulation of the Dow COB index, an index of market prices for electricity in the relevant geographic area. *Id.* at 246. The contract at issue in *Chang* relied on the index in setting prices. *Id.*

Hemlock convincingly points out that *Chang* is distinguishable because (1) the parties' very purpose in adopting the contract provision in that case was to use the index to allocate risks, and (2) that purpose was frustrated when the index ceased to accurately reflect the true market price for electricity in the relevant geographic area. Here, the contract price was fixed specifically to avoid market fluctuations, just the opposite of the pricing mechanism in *Chang*. We thus agree that *Chang* is readily distinguishable. In sum, the district court did not err in rejecting Sachsen's impracticability and frustration-of-purpose defenses.

**D.      The district court did not err in awarding Hemlock the full amount of the remaining contract price as liquidated damages, despite Sachsen's argument that the award was an unreasonable penalty.**

Sections 5 and 10(b) of LTAs I–III and section 11(c)(iii)(C) of LTA IV provide that, in the event of a breach by Sachsen and termination by Hemlock, the full balance of the contract price for the entire remaining term of the LTAs will be awarded to Hemlock as liquidated damages. Accordingly, after granting summary judgment to Hemlock on its breach-of-contract claim, the district court awarded Hemlock damages in the total amount of $793,467,822.91. This amount included the entire outstanding balance due Hemlock for the full term of each of the LTAs—$585,361,500—plus prejudgment interest. The district court also awarded Hemlock post-judgment interest on the principal amount at the contractually mandated interest rate.

Sachsen does not dispute that the judgment accurately reflects the outstanding balance or the interest thereon. Instead, Sachsen argues that the LTAs' provision for the award of the full outstanding balance constitutes an unenforceable penalty rather than permissible liquidated damages.

Under Michigan law, liquidated-damages provisions are enforceable "if the amount is 'reasonable with relation to the possible injury suffered' and not 'unconscionable or excessive.'" *UAW-GM Human Resource Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 421 (Mich. Ct. App. 1998) (quoting *Moore v. St. Clair County*, 328 N.W.2d 47, 50 (Mich. Ct. App. 1982)). Liquidated damages are especially appropriate "where the damages which would result from a breach are uncertain and difficult to ascertain" when the contract is executed. *Moore*, 328 N.W.2d at 50 (quoting *Curran v. Williams*, 89 N.W.2d 602, 604 (Mich. 1952)). Courts are to determine the enforceability of liquidated-damages provisions based on the circumstances existing at the time that the contract was executed, not at the time of the breach. *Barclae v. Zarb*, 834 N.W.2d 100, 120 (Mich. Ct. App. 2013). Generally, courts should give effect to the parties' intent and enforce liquidated-damages provisions unless "it is obvious from the contract . . . that the principle of compensation has been disregarded." *Curran*, 89 N.W.2d at 605.

Sachsen argues that the liquidated-damages award in the present case unreasonably failed to account for the cost savings that Hemlock experienced in not having to produce polysilicon

for Sachsen after the breach. An award of lost profits, Sachsen argues, would better reflect the actual damages that Hemlock sustained. Maureen Egan, one of Hemlock's consulting experts, estimated that Hemlock's lost profits totaled approximately $378.8 million (excluding interest). Sachsen points to this figure—which is approximately $206.6 million less than the principal amount of the liquidated-damages award—as evidence that the award is unconscionable.

The district court acknowledged the large disparity between the liquidated-damages award and Egan's calculation of lost profits. Nevertheless, the court concluded that the liquidated-damages provision was enforceable because (1) Sachsen had not produced its own calculation of damages, and (2) the circumstances underlying the parties' decision to enter into a take-or-pay contract rendered an award of liquidated damages appropriate.

The district court concluded that Sachsen would have borne the burden of demonstrating at trial that an award based on the liquidated-damages provision would be unconscionable and, consequently, that Sachsen bore the burden at the summary-judgment stage of demonstrating that a genuine dispute of material fact existed on that issue. This assignment of the burden of proof is reasonable and consistent with this court's caselaw. *See Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010) (explaining that after the party moving for summary judgment has established a prima facie case for recovery, the burden shifts to the nonmoving party to introduce facts showing that a genuine issue of material fact exists); *Exar Corp. v. Nartron Corp.*, 89 F.3d 833 (Table), 1996 WL 301719, at *2 (6th Cir. June 4, 1996) (suggesting that the party challenging a liquidated-damages provision bears the burden of demonstrating that the provision was unreasonable when executed). Our research has revealed no indication that Michigan law provides otherwise.

But Sachsen did point to evidence in the record—the Egan report by Hemlock's consulting expert—in support of its argument that the liquidated-damages award is unconscionable. Neither the district court nor Hemlock cites any authority for the proposition that Sachsen cannot base its defense on the Egan report simply because Hemlock's own expert drafted the report. We therefore decline to rely on the fact that Sachsen did not produce its own damage calculations.

Nevertheless, the district court's second ground for enforcing the liquidated-damages provision is persuasive. The court noted that Sachsen objected to the provision's failure to account for the cost savings that Hemlock enjoyed because it no longer needed to produce polysilicon for Sachsen after the breach. Although such cost savings might factor into an ordinary breach-of-contract claim, the court concluded that considering cost savings was inappropriate in the context of the take-or-pay provision. Hemlock, in other words, was entitled to full payment under the LTAs even if Sachsen refused delivery of the polysilicon. Under these circumstances, Hemlock would have had no need to produce the polysilicon, but would still be entitled to be paid in full. The court persuasively reasoned that the LTAs therefore contemplated situations in which Hemlock's cost savings would be irrelevant to the amount of payment that Hemlock was due.

Similarly, liquidated damages are appropriate because the take-or-pay provision contemplates that either party could end up profiting, depending on how the LTA price compared from time to time to the market price. Earlier in the LTAs' history, Sachsen greatly benefitted from the take-or-pay nature of the contracts because the LTA price was well below the market price. Another of Hemlock's experts, Dr. John Finnerty, estimated that Sachsen benefited by $509.1 million between 2006 and 2012 due to this price differential. In those years, Hemlock experienced a corresponding loss of revenue due to the LTAs because it would have made more money if it had been able to sell the polysilicon at the market price. But at the time of the breach, the LTAs had become unprofitable for Sachsen rather than for Hemlock, and Sachsen now argues that the liquidated-damages award is a "windfall" for Hemlock.

This argument has no merit. Restricting Hemlock's recovery to lost profits without accounting for the fact that Sachsen saved (and Hemlock lost) approximately $509.1 million earlier in the contract term would be inequitable. In light of the fact that Sachsen benefited substantially in the earlier years of the LTAs, the liquidated-damages award is not "unconscionable or excessive." *See UAW-GM Human Resource Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 421 (Mich. Ct. App. 1998) (quoting *Moore v. St. Clair County*, 328 N.W.2d 47, 50 (Mich. Ct. App. 1982)).

This is also a situation where liquidated damages are especially appropriate because actual damages would have been difficult to measure when the contract was executed. *See Moore*, 328 N.W.2d at 50. The 41-page Egan report indicates that calculating lost profits—even with the information available at the time of breach—is no easy task. Factors in the lost-profits calculation included, among other things, Hemlock's costs of raw materials, utilities, and labor, as well as an analysis of the "discount rate" (an estimate of the conversion of a monetary sum from a future time period into a present value). Estimating the value of many of these factors requires that a number of assumptions be made.

Attributing lost profits to Sachsen's breach of contract is thus a challenging task. Hemlock had other customers in addition to Sachsen, several of whom Hemlock also sued for breaching their respective LTAs. Further complicating the analysis, Hemlock used the same manufacturing processes for solar polysilicon as for another, more expensive semiconductor polysilicon, and the Egan report did not attempt to calculate costs specific to solar polysilicon. Estimating Hemlock's lost profits in the event of breach at the time the contract was executed would have been even more difficult because the parties would have had no information about Hemlock's post-breach costs or savings.

The district court also noted that although Sachsen cited the Egan report to argue that there was a great disparity between actual and liquidated damages, Sachsen did not expressly adopt the report's conclusions as correct. If Sachsen were to dispute the report's calculations, we assume that Sachsen would challenge a number of the assumptions made by the report. The liquidated-damages provision in the LTAs, in contrast, reflects the parties' intent to agree upon a simple formula for damages (the remainder of the outstanding contract balance) in the event of a breach by Sachsen and termination of the contract by Hemlock. That formula is reasonable given the fact that the parties agreed to a take-or-pay arrangement under which both parties experienced substantial gains and losses at various times. A formula that more closely approximated Hemlock's actual lost profits would require a complex estimation of the costs that Hemlock would save from not manufacturing polysilicon for Sachsen, which would be difficult, if not impossible, to determine as of the time of contracting.

Finally, the district court enforced the liquidated-damages provision in part because the LTAs contemplated that Hemlock would invest substantial amounts of capital in expanding its manufacturing facilities, and Sachsen's breach "result[ed] in a loss of prior capital commitments toward expansion." Indeed, the liquidated-damages provision contains an introductory paragraph stating Sachsen's understanding that Hemlock "is making substantial capital investments to expand its manufacturing capabilities in order to satisfy [Sachsen's] demand." That paragraph goes on to explain that the parties' "express intent" was to ensure that Sachsen "is obligated to purchase the contracted volumes over the Initial Term" of the LTAs.

In light of this language, the liquidated-damages provision can be interpreted as taking into account Hemlock's expansion costs. This court has enforced a similar provision because it reflected the parties' understanding that the plaintiff would undertake "large expenditures" to expand its production facilities. *See City of Memphis v. Ford Motor Co.*, 304 F.2d 845, 853 (6th Cir. 1962) (concluding that a contract provision requiring Ford to make minimum monthly payments for electricity for a five-year term even after shutting down its plant was reasonable because the consideration for the contract was partly that the City of Memphis would expand its electric-power plant to meet Ford's needs). We apply the same reasoning here and conclude that the liquidated-damages provision is not an unenforceable penalty.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.